## Exhibit 1

**The Exhibits**

**<u>EXHIBIT A</u>**

Case 25-12179-LSS    Doc 8-1    Filed 12/13/25    Page 3 of 103

Digitally signed by Advance Performance Exponents Inc.
Date: 2025.08.18 14:49:13 -05:00
Reason: Apex Certified
Location: Apex

**FSD2025-0146**            **Page 1 of 7**            **2025-08-18**



Neutral Citation Number: [2025] CIGC (FSD) 83

Cause No: FSD 2025-0146 (JAJ)

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

BETWEEN:

**(1)**    **UNICORN BIOTECH VENTURES ONE LTD**
**(as general partner of RIGMORA BIOTECH INVESTOR ONE LP)**
**(2)**    **UNICORN BIOTECH VENTURES TWO LTD**
**(as general partner of RIGMORA BIOTECH INVESTOR TWO LP)**

**Plaintiffs**

-and-

**ATP III GP, LTD**
**(as general partner of ATP LIFE SCIENCE VENTURES, L.P.)**

**Defendant**

| | |
|---|---|
| **Appearances:** | **Mr Andrew Scott KC instructed by Mr Liam Faulkner and Mr Hugo Farmer of Campbells LLP for the Plaintiffs** |
| | **Ms Sue Prevezer KC instructed by Mr Rupert Bell, Mr Blake Egelton and Ms Rebecca Moseley of Walkers (Cayman) LLP for the Defendant** |
| **Before:** | **The Honourable Justice Jalil Asif KC** |
| **Heard:** | **1 August 2025** |
| **Ex tempore judgment delivered:** | **1 August 2025** |
| **Finalised judgment approved:** | **18 August 2025** |

*Injunction—whether to vary terms of injunction in certain respects*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# JUDGMENT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

A.    <u>**Introduction**</u>

1.    On 20 June 2025, I granted an injunction on the Plaintiff's *ex parte* on notice summons filed on 12 June 2025 against the Defendant, ATP III GP Limited as general partner of ATP Life Science Ventures, L.P. ("the Partnership"). The Partnership is structured as an exempted limited partnership under Cayman Islands law with a single general partner entity, which is the Defendant in this action. The background is a dispute between the main investors in the Partnership and its general partner. The Plaintiff investors, who are two limited partnerships, are a vehicle for Dr Dmitri Rybolovlev, a Cypriot national of Russian origin. The sole director of the general partner, Dr Seth Harrison, is an entrepreneur responsible for developing a number of portfolio companies, each of which is involved in the life sciences industry, with a particular focus on developing new cancer treatments. He and his family trusts and certain employees comprise the other investors in the Partnership.

2.    The Plaintiffs say that they have contributed all of the capital which they are required to contribute to the Partnership. The Defendant disagrees and has made a number of capital calls, mainly on 30 May 2025, demanding payment of a total of over US $100 million. In default of payment of the capital calls, the Defendant has power under the limited partnership agreement to serve default notices, which may ultimately cause the Plaintiffs to be deemed to be defaulting partners with potentially dire consequences for them, including the Defendant's ability to confiscate up to 50% of their existing interest in the fund and to re-allocate it to other limited partners. It was common ground before me that the Partnership is worth several billion US dollars, and that the Plaintiffs have over 90% of the beneficial interest in the Partnership. Thus, confiscation of up to half of that interest would be very significant in value. Against that background, the Plaintiffs sought the interim injunction from me which I granted on 20 June 2025.

3.    The terms of the injunction are as follows:

> "1.     Until further order, the Defendant, as sole general partner of ATP Life Science Ventures, L.P., is restrained from:
>
> a)     taking any steps to designate, deem or treat the Plaintiffs as a "Defaulting Partner"; and
>
> b)     taking any steps to issue or enforce any purported "Default Notice" or "Default Charge" against the Plaintiffs;
>
> pursuant to the First Amended and Restated Limited Partnership Agreement dated 1 November 2012 (as amended) arising out of or in relation to the Plaintiffs' non-payment of the capital calls issued by the Defendant on 30 May 2025 and 1 June 2025 respectively."

4.    Paragraph 2 of the injunction order provides:

> "2.     Until further order, the Defendant shall not issue any further capital calls to either of the Plaintiffs unless expressly agreed after the date of this Order in writing by that Plaintiff."

and then there are other provisions dealing with service of the order, etc.

5.    The return date on that injunction is the first of five matters that are before me today in this action and in a linked petition to wind up the Partnership on the just and equitable basis. Happily, I can record that the other four substantive matters, namely a summons to stay in each action and a summons for directions in each action have now been agreed between parties.

6.    I also record by way of relevant background context that there are ongoing parallel proceedings in Delaware between the parties, which were commenced by ATP III GP Ltd (as general partner of the Partnership) on 30 May 2025. I have been told that in the Delaware proceedings, the Chancellor has made an order that the trial be expedited, and it is due to be heard on 18 and 19 September 2025.

7.    The Defendant makes a number of complaints about the grant of the injunction but does not seek today to set aside or to discharge it. What the Defendant does do, however, is to apply to vary the injunction in two primary respects. Ms Sue Prevezer KC, who appears on behalf of the Defendant today, says that these variations are to make the terms of the injunction hold the ring more fairly between the parties.

8.    The first of the variations sought by the Defendant is that it should be permitted to make further capital calls on an on-going basis; and the second is that the injunction should be framed so that, rather than continue in effect until further order, it automatically lapses on delivery of a substantive judgment, either in Delaware or in the Cayman Islands, whichever of those occurs first. Thirdly, in

addition to those variations to the injunction, the Defendant seeks fortification of the Plaintiffs' undertaking in damages attached to the injunction. I will deal with those three aspects in sequence.

## B.    Should the Defendant be permitted to make further capital calls?

9.    In support of the Defendant's application to vary the injunction, Ms Prevezer indicates that the Defendant will undertake to take no action in the meantime in respect of any further capital calls that are made, for example in relation to the Plaintiffs' potential loss of voting or approval rights. During oral argument, it became clear that what is really driving the Defendant's request to vary the injunction to allow it to make further capital calls is that the Defendant wants to start the clock running on the consequences of non-compliance with the capital calls, in accordance with the contractual mechanism in the limited partnership agreement, as early as possible. The time period in question is at least 35 days, which is made up of 5 business days following the date when the capital call is due, and then a further 30 day grace period following service of a default notice, during which the limited partner can make a late payment without necessarily triggering the ability of the Defendant to treat it as a defaulting partner. The Defendant wants to be able, immediately on day one after the Delaware judgment has been delivered, to treat the Plaintiffs as defaulting partners with all the consequences attendant on that status.

10.    The Plaintiffs, represented today by Mr Andrew Scott KC, respond that that puts them in an impossible position. If the Delaware judgment goes in the Defendant's favour then, the Plaintiffs say, it is simply not practical for the Plaintiffs to fund any such further capital calls as soon as judgment is delivered. That is likely to be right, bearing in mind the capital calls made on 30 May 2025 and likely size of the capital calls that are going to be made. The Plaintiffs say that the Defendant will therefore be able immediately to treat them as being in default with very serious consequences. The alternative is that they would have to pay the capital calls under protest, with no realistic chance of any money being repaid if the Plaintiffs were to win.

11.    In support of that latter point, Mr Scott points out that: (a) there is no undertaking from the Defendant to make any such repayment; (b) the Defendant has no assets; and (c) the purpose of the capital call is to meet ongoing expenses of the Defendant and the portfolio companies, so it is very unlikely that there would be any funds left to repay the Plaintiffs if they are successful in their position, whether

in Delaware or in Cayman. In response, Ms Prevezer says the Plaintiffs can apply in Delaware for a stay if the judgment goes against them, in order to give them a breathing space to fund any further capital calls that have been made.

12.    I am not sure that is necessarily correct, given what appears to be in issue in the Delaware proceedings. In any event, it seems to me that it provides a rather uncertain approach to achieving a suitable balance between the Plaintiffs' position and that of the Defendant.

13.    On balance, I agree with the Plaintiffs' position that the requested variation does not more fairly hold the ring between the Plaintiffs and the Defendant. The right to issue capital calls is at the very heart of the current dispute. Varying the injunction to allow the Defendant to make further capital calls, it seems to me, is not holding ring. Instead, it is pre-supposing that the Defendant is likely to succeed on its case that it is contractually entitled to make such calls, and to the benefit of running down the clock on the consequences of default.

14.    I am concerned that what is driving the Defendant's application is an effort to give the Defendant the strategic advantage of being able to apply economic pressure to the Plaintiffs in an inappropriate manner. If the Defendant's case succeeds, the Plaintiffs will be deemed to be defaulting partners immediately following a judgment, without the Plaintiffs having a proper opportunity to pay within the regime intended by the limited partnership agreement, unless they are successful in persuading the Delaware judge to grant them a stay.

15.    The alternative for the Plaintiffs of paying under protest, in my view, is not a realistic option given that there is no evidence of any ability on the Defendant's part to make a repayment if the Plaintiffs are the successful party, and the available material points the other way. Accordingly, for those short reasons, I am against the Defendant on its application to vary the injunction order to allow it to make further capital calls before determination of the dispute between the parties.

**C.    Should the injunction be framed to terminate automatically upon a judgment on the merits?**

16.    The second variation sought by the Defendant is to vary the order so that it no longer remains in place until further order but automatically terminates or falls away upon delivery of the earlier of a judgment on the merits in Delaware or in this writ action. As this writ action has just been fixed for trial in the middle of January 2026, it is likely, therefore, that judgment would be given in Delaware first, so that the Cayman injunction would automatically terminate then.

17.    I am not with the Defendant on this point. The difficulty with the Defendant's proposal is that it assumes that the outcome in Delaware is binary. The reality is that it is impossible to know in advance what will be the content of the Delaware judgment, what issues it will decide in what way and what impact the judgment in Delaware will have on the issues in the Cayman proceedings. I agree with the Plaintiffs that it is for the Cayman court to retain control over the duration and terms of the injunction, and whether and when it is discharged or varied in light of whatever decision is made in Delaware. So, I reject the Defendant's request to vary the terms of the injunction to that extent.

**D.    Should the Plaintiffs provide fortification of their undertaking in damages?**

18.    The Defendant seeks fortification of approximately US $100 million to reflect the potential damage to the portfolio companies which, it says, is ongoing and occurring as a result of the lack of immediate funding available to them.

19.    The difficulties with that position are, first of all, there is a significant question mark over what loss the Partnership will suffer, and the values of the portfolio companies on which that loss will be based. The estimates made by Dr Harrison in his evidence appear to be significantly overinflated as they are based on potential future values that the early-stage development companies or clinical stage companies may have in the future, rather than reflecting the current-day values of the portfolio companies. I am therefore not confident that the figure of US $100 million sought is a realistic reflection of the current values of those companies.

20.   Secondly, Mr Scott is right to question the causation of any losses. There is force in his submission that any impact on the portfolio companies flows not from the fact that there is an injunction in place, but from the underlying dispute between the parties over whether the Plaintiffs are obliged to provide further capital funding or not.

21.   Thirdly, and in my view this really is the most significant aspect, if there is any loss suffered by the Partnership which is caused by the injunction, then recovery of that loss will be easily enforceable against the Plaintiffs' interests in the Partnership, which are worth over US $3.8 billion and which are within the jurisdiction of the Cayman Islands court. For those reasons, I refuse the Defendant's request for fortification of the Plaintiffs' undertakings.

**Dated 18 August 2025**

**THE HONOURABLE JUSTICE JALIL ASIF KC**
**JUDGE OF THE GRAND COURT**

**EXHIBIT B**

Case 25-12179-LSS    Doc 8-1    Filed 12/13/25    Page 11 of 103

Digitally signed by Advance Performance Exponents Inc.
Date: 2025.11.21 14:55:52 -05:00
Reason: Apex Certified
Location: Apex

FSD2025-0151                    **Page 1 of 78**                    **2025-11-21**



**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 151 OF 2025 (JAJ)**

**IN THE MATTER OF THE EXEMPTED LIMITED PARTNERSHIP ACT (2025 REVISION), THE COMPANIES ACT (2025 REVISION) AND THE PARTNERSHIP ACT (2025 REVISION)**

**AND IN THE MATTER OF ATP LIFE SCIENCE VENTURES, L.P.**

---

**<span style="color:red">AMENDED</span> DEFENCE TO THE PETITIONERS' <span style="color:red">AMENDED</span>**

**WINDING UP PETITION**

**<span style="color:red">(amended pursuant to an Order dated 31 October 2025 in these proceedings)</span>**

---

**A.    <u>INTRODUCTION</u>**

1.    This is the <span style="color:red">Amended</span> Defence to the <span style="color:red">Amended</span> Winding Up Petition dated 6 June 2025 (the "**Petition**") presented by the Petitioners, Unicorn Biotech Ventures One Ltd (in its capacity as general partner of Rigmora Biotech Investor One LP) and Unicorn Biotech Ventures Two Ltd (in its capacity as general partner of Rigmora Biotech Investor Two LP) (together, the "**Petitioners**") against (i) ATP Life Science Ventures, L.P. (the "**Partnership**") and (ii) ATP III GP, Ltd. in its capacity as the general partner of the Partnership (the "**GP**").

1

45569452.2.A8559.197133

1A. Nothing in this Amended Defence constitutes, is intended to or should be understood as a waiver of privilege.

2. ~~For the avoidance of doubt~~ As confirmed by the judgment of Asif J following the CMC hearing on 31 October 2025 ([2025] CIGC (FSD) 106), ~~the correct Respondent to~~ the Petition is a proceeding against the Partnership, acting by the GP pursuant to section 33(1) of the Exempted Limited Partnership Act. Consequently, in this Amended Defence the GP pleads to the Petition in its capacity as the general partner acting for and on behalf of the Partnership, and references to the "GP" should be read accordingly. Any admissions in this Defence are made by the GP in its capacity as the general partner acting for and on behalf of the Partnership. It is denied that the GP is a proper party to the Petition in its individual capacity, and any allegations in the Petition that may be made against the GP personally are denied.

3. At the outset, many allegations and the basis on which the Petition has been issued against the Partnership are fabricated, and are denied in their entirety. Whilst the Petition seeks to portray the Partnership as a failed business venture in which the Partnership has invested in numerous loss-making ventures such that the Petitioners' investments are inherently at risk and unlikely to yield any returns, this is simply incorrect.

4. Rather, the Partnership has been hugely successful and its existing investments have resulted in exceptional returns to the Partnership, and its limited partners as a whole, including the Petitioners:

   (a) The limited partners have invested total capital of approximately US$2.3 billion with the Partnership.

45569452.2.A8559.197133

(b)     The total value of the Partnership (current net asset value plus prior distributions) was last valued by third-party providers on 31 December 2024 at US$6.2 billion.

(c)     Distributions have been made to the limited partners in total amounts of circa US$2.3 billion, of which circa US$2.1 billion has been paid to the Family Office (as defined below).

5.     Despite the Partnership's extraordinary successes, it is apparent that the Petitioners no longer wish to continue to fund the Partnership. However, the Petitioners are contractually bound to meet their funding obligations to the Partnership, pursuant to the terms of the Limited Partnership Agreement concerning the Partnership, as amended (the "**LPA**"), and the Petitioners are currently in breach of those funding obligations.  In particular, the Petitioners have failed to meet capital calls issued on 30 May and 1 June 2025 in the overall sum of US$107 million (the "**Capital Calls**"), which were issued in respect of budgets that the Petitioners had previously approved.   The Petitioners have asserted, incorrectly, that they are not required to meet the Capital Calls, and that they have fulfilled their overall capital commitment to the Partnership and are not required to contribute any further capital.  The Partnership and its portfolio companies have already suffered as a result of the Petitioners' failure to pay the Capital Calls and their unwillingness to provide any further funding to the Partnership, and numerous employees have lost their jobs as a result.  The issue of the Petition is an attempt by the Petitioners to avoid the consequences that they may otherwise suffer, pursuant to the terms of the LPA, as a result of breaching their funding obligations to the Partnership.

6.     On 30 May 2025, the GP acting on behalf of the Partnership issued legal proceedings against the Petitioners before the Court of Chancery of the State of Delaware, United States, with claim number C.A. No. 2025-0607-KSJM (the "**Delaware Proceedings**").  In the Delaware Proceedings, the GP seeks orders

45569452.2.A8559.197133

compelling the Petitioners to fulfil their funding obligations to the Partnership pursuant to the LPA.

7.      Following the issue of the Delaware Proceedings:

(a)     On 2 June 2025, only one business day after the Delaware Proceedings were filed, the Petitioners issued legal proceedings against the GP (in its capacity as general partner of the Partnership) with this Honourable Court in terms of a Writ of Summons dated 2 June 2025, with Cause No.: FSD 146 of 2025 (JAJ) (the **"Writ"**).

(b)     Just four days later, on 6 June 2025, the Petitioners filed the Petition.

8.      As the Plaintiffs have admitted in the Delaware Proceedings and elsewhere, the Delaware Proceedings, the Petition, and the Writ concern the same or substantially the same issues. In particular, the proceedings in each case relate to the Petitioners' liability to contribute further capital to the Partnership, and the GP's ability to issue capital calls on behalf of the Partnership and the Petitioners' liability to meet those capital calls.  The relief sought by the Petitioners in the Writ substantially overlap with the Delaware Proceedings, and the Petitioners unsuccessfully sought to have the Delaware Proceedings stayed in favour of the Writ and the Petition.

9.      It is averred that the Petitioners filed the Writ and the Petition as retaliatory measures in response to the Delaware Proceedings, and in an attempt to circumvent and undermine the Delaware Proceedings.  In particular, by issuing the Petition the Petitioners seek: (1) to avoid their obligations to commit further capital to the Partnership pursuant to the terms of the LPA; and (2) to have the underlying factual disputes determined in the Cayman Islands, rather than in the Delaware Proceedings, in breach of their obligations under paragraph 18(g)(vi) of the LPA in which the parties agreed that the Courts of Delaware or the Cayman Islands would

45569452.2.A8559.197133

have jurisdiction to hear disputes arising out the LPA and waived any claim that proceedings brought in such jurisdictions are brought in an inconvenient forum or that the venue is improper.

10.     Prior to the issue of the Petition, the Petitioners had not asserted any breakdown of trust and confidence.  The fact that the Petitioners have now raised this allegation in an apparent attempt to wind up the Partnership is simply a strategy to avoid their capital obligations under the LPA.  As will become clear in the exchange of evidence in the Petition (and in the Delaware Proceedings and the Writ), the Petitioners have acted unilaterally, and in breach of their obligations under the LPA, in failing to pay the recent Capital Calls.

11.     Furthermore, in attempting to abrogate their responsibility to fund (and to consider and approve budgets in relation to) a significant number of the Partnership's portfolio companies, the Petitioners are simply seeking to cherry pick the investments they may desire at some future time to fund, in breach of the Petitioners' obligations under the LPA and in a blatant attempt to seize and take control of the operations and the funding needs of the Partnership, which role falls to be carried out by the GP.

12.     In the premises, and for the reasons which are set out in further detail in this Amended Defence below, any purported loss of trust and confidence in the GP and the Partnership on the part of the Petitioners is not justifiable.  Accordingly, the Petition must be dismissed.

13.     In this Amended Defence:

        (a)     Unless otherwise stated, references to paragraphs are to paragraphs in the Petition.

        (b)     Where appropriate, the abbreviations and headings used in the Petition are adopted, without admission as to their accuracy or relevance.

45569452.2.A8559.197133

(c)    Where the Respondent refers to a written agreement or correspondence, it does so by way of summary and will refer to that agreement or correspondence in due course, for its full terms, meaning and effect.

(d)    Where the Respondent does not admit an allegation in the Petition, it is unable to admit or deny that allegation, and where relevant it requires the Petitioners to prove the same.

(e)    Unless expressly admitted or not admitted below, the Respondent denies each and every allegation in the Petition.

14.    Paragraphs 1 and 2 of the Petition are noted, save that, as stated above, it is averred that the ~~correct respondent to~~ the Petition is a proceeding against the Partnership acting by the GP.

15.    As to the first sentence of Paragraph 3 of the Petition, it is denied that there has been serious or any mismanagement and/or lack of probity in the conduct of the affairs of the Partnership by the GP as alleged or at all.  The second sentence of Paragraph 3 is admitted.

16.    The first sentence of Paragraph 4 of the Petition is denied. As to the particulars pleaded in support of the alleged loss of trust and confidence (which is denied):

(a)    The Capital Call notices were issued in accordance with the LPA and the GP's duties to act in the interests of the Partnership as a whole, and not in breach thereof.   The capital called was within the Petitioners' capital commitments under the LPA.  Further, the Capital Calls were each made in accordance with the budgets approved by the Petitioners.  Accordingly, any alleged violation of the LPA or the GP's duties is denied.

(b)    Save that it is averred that the GP brought the Delaware Proceedings as it was entitled to do under the LPA and as it was required to do, at all times

6

acting in the best interests of the Partnership in response to the Petitioners' breach of their funding obligations under the LPA, subparagraph (b) is denied.  The GP will refer to the Verified Complaint issued in the Delaware Proceedings at the hearing of the Petition for its full terms and effect.

(b1)    For the reasons set out below, including paragraphs 69A and 69B, Paragraph 4.b1 is denied.

(b2)    For the reasons set out below, including in paragraphs 69C to 69H below, Paragraph 4.b2 is denied.

(b3)    For the reasons in paragraphs 69I to 69K below, Paragraph 4.b3 is denied.

(b4)    For the reasons in paragraphs 69L and 69M below, Paragraph 4.b4 is denied.

(c)    It is denied that the GP has improperly charged its expenses to the portfolio companies and/or failed to provide necessary information to the Petitioners in a timely manner or at all.  The GP has provided the Petitioners with all necessary information for the Petitioners: (i) to approve further budgets for the portfolio companies, which the Petitioners have refused to do in breach of the LPA; and/or (ii) to scrutinise expenses, which have been properly charged to the Partnership. For the avoidance of doubt, it is denied that any expenses have been improperly charged to the Partnership.

(d)    It is denied that the GP has a or any conflict of interest and/or has been acting in breach of its fiduciary duties to act in the best interests of the limited partners as a whole, as alleged or at all. In particular, it is denied that the GP has been acting in the interests of the portfolio companies in place of the interests of the limited partners as a whole, and that the GP has been acting in its own interests or for the improper purpose of placing pressure on the Petitioners, ~~by exposing the Partnership to open ended~~

45569452.2.A8559.197133

~~binding commitments to the portfolio companies and/or~~ in seeking to compel the Petitioners to provide further funding to the portfolio companies against the wishes of the Petitioners and/or in breach of the LPA as alleged or at all.

17.   In the circumstances, it is denied that the substratum of the Partnership has been lost as alleged and/or that there is a need for an independent investigation into the Partnership's affairs, as alleged in Paragraph 5 or at all.

**B.**   **THE PARTNERSHIP**

18.   Paragraph 6 of the Petition is admitted.

19.   Save as pleaded below, Paragraphs 7 and 8 of the Petition are admitted:

(a)   Dr Rybolovlev is a Russian citizen who acquired Cypriot citizenship by investment in approximately 2010.  He currently resides in Monaco.

(b)   Dr Rybolovlev and Dr Harrison first met in 2010 and first established, in 2011, an investment fund, ATP III, L.P., to make investments in the life science industry with US$100 million funding from the Family Office of Dr Rybolovlev (the "**Family Office**").

(c)   In October 2012, Dr Rybolovlev agreed to provide a US$1.5 billion capital commitment from the Family Office and on 29 October 2012 the Partnership was formed as a Cayman Island exempted limited partnership, through the execution of a limited partnership agreement of that date. On 1 November 2012, the LPA was amended and restated. Since 2012, the LPA has been amended 22 times, by agreement.

(d)   The Family Office indirectly owns the Petitioners, through whom, since June 2024, it has provided funding to the Partnership. From the

8

45569452.2.A8559.197133

Partnership's formation in 2012 until June 2024, the Family Office's interests were held through BVI entities named Blue Horizon Enterprise Limited ("**Blue Horizon**") and Ezbon International Limited ("**Ezbon**"). By assignment and assumption agreements dated 10 July 2024, Blue Horizon's partnership interest was transferred to the First Petitioner and Ezbon's partnership interest was transferred to the Second Petitioner, effective from 30 June 2024.

(e)     It is denied, if it is alleged, that the Partnership is or should be regarded as an investment vehicle of the Family Office. In addition to the Family Office's investment, Dr Harrison has contributed US$54.7 million to the Partnership, initially funded by way of loan from Ezbon (now fully repaid) as pleaded to at paragraph 24(b) below. Furthermore, as stated in paragraph 23 below, there are 14 additional limited partners, who are current or former employees of entities connected to ATP.

20.    Paragraphs 9 and 10 of the Petition are admitted.

21.    Paragraph 11 of the Petition is denied. As at June 2025, the contingent subscriptions of the Petitioners totalled US$2,850,681,777 and the total capital contributions of the Petitioners were approximately US$2.3 billion. As at June 2025, the Partnership has made distributions to the Petitioners of approximately US$2.1 billion, made up of cash and marketable securities. The Petitioners' capital contributions to the Partnership represent approximately 97.9% of all the capital contributions made to the Partnership.

22.    Paragraph 12 of the Petition is admitted.

23.    As to Paragraph 13 of the Petition:

45569452.2.A8559.197133

(a)    ~~The first sentence is denied, if by the term "affiliated" it is intended to suggest that the GP has some control over the other limited partners of the Partnership.~~

(b)    It is denied that there are only 12 limited partners who are former or present employees of ATLS.  There are 14 limited partners of the Partnership, in addition to the Petitioners, Les Pommes and Dr Harrison.  These 14 partners are current or former employees of entities connected to ATP.  ~~The most current version of the list of partners was provided to the Family Office on 16 July 2025.~~

(c)    Each and every one of the aforesaid 14 limited partners is a party to the LPA.

(d)    ~~Whilst it is admitted that none of the aforesaid 14 limited partners has contributed capital to the Partnership, they have each contributed their time, work, and expertise to the success of the Partnership.~~

(e)    ~~There is no legal justification for the Petitioners not to accept the aforesaid 14 limited partners as legitimate limited partners.~~ Each of the 14 limited partners has a legally binding interest in the value of the Partnership.

24.    As to Paragraph 14 of the Petition and as pleaded aforesaid:

(a)    It is denied that US$2.7 billion of capital has been invested into the Partnership ~~and that 99% of the capital contributed to the Partnership has been provided by the Petitioners~~. The total amount contributed by the Petitioners as at June 2025 was US$2.3 billion representing 97.9% of the total amount contributed to the Partnership.

(b)    As regards the capital contributed by Les Pommes and Dr Harrison, the correct amount is US$54.7 million, not US$53.8 million as pleaded, and the

45569452.2.A8559.197133

loan from Ezbon (which was used to initially fund Dr Harrison's contribution) was fully repaid by Dr Harrison through cash payments, offsets to his management fee and the transfer of portions of his limited partnership interest in the Partnership. ~~has been repaid in full out of carried interest value owed to Dr Harrison.~~

(b1)   The fact that the other limited partners have not contributed any capital to the Partnership is irrelevant. For the avoidance of doubt, the aforesaid individuals have each contributed their time, work, expertise and/or intellectual property to the success of the Partnership, in consideration of which they have been granted interests in the Partnership. In this way, the Partnership operates as a joint venture between those who have contributed capital and those who have contributed and are still contributing work and other things of value, both of which are necessary, in combination, to create the value that the Partnership was intended to create and has created: namely, new medicines, new technologies upon which new medicines can be created, new biotech companies based upon new inventions, and capital returns.

(c)   Paragraph 4 above is repeated: the Partnership has been hugely successful and the Petitioners' US$2.3 billion in capital contributions has translated into a Partnership with an estimated value of US$6.2 billion, built on the skill and efforts of the GP.

25.   Paragraph 15 of the Petition is admitted.

26.   Paragraph 16 of the Petition is admitted.

27.   Paragraph 17 of the Petition is admitted. Amendment No. 13 to the LPA dated 4 February 2019 introduced a concept of pools to the LPA. Each pool is composed of a group of assets and the income, capital contributions and liabilities associated

45569452.2.A8559.197133

with those assets. The pools within the current structure of the Partnership are as follows:

(a)    Pool ATP-IV: This pool contains the residuals from older investments of the Partnership that have already been exited;

(b)    Pool V: Following the successes in ATP IV, this pool was created to found and build new companies and, using a newly recruited team, to continue to develop certain of the already established companies in ATP IV. Pool V contains three sub-pools:

   (i)    Pools ATP V-1 and ATP V-2: These pools contain newer deals that Dr Harrison and his team founded and are working to develop towards clinical proof of concept or other value milestones at which point their value can be realised. Total capital of US$1 billion was allocated to this pool; and

   (ii)    Pool ATP V-3: This pool contains deals that were founded by a prior team and Dr Harrison, that were successfully taken forward by the current team. Total capital of US$500 million was allocated to this pool; and

(c)    Pool Braeburn: This pool contains the assets of one company, Braeburn Inc ("**Braeburn**"), which holds the regulatory approval for and markets a drug indicated for the treatment of opioid addiction. The Family Office had committed capital of circa US$393 million to this pool (US$203 million of which has come via the transfer of securities, and US$190 million in additional funding through a Royalty Purchase Agreement ("**RPA**")), and has contributed circa US$412 million.  Distributions of circa US$668 million have been made to the Family Office in relation to this pool, and there remains US$2.2 billion of value in Braeburn.

45569452.2.A8559.197133

28.     Paragraph 18 of the Petition is admitted.

29.     As to Paragraph 19 of the Petition, the GP will refer to the LPA at the hearing of the Petition for its full terms and effect. Save as aforesaid, the GP pleads as follows in relation to the sub-paragraphs of Paragraph 19:

(a)     As to Paragraph 19(a), it is denied that the amount of each limited partner's Contingent Subscription is determined by the individual subscription agreement entered into between that limited partner and the Partnership (the "**Subscription Agreements**"):

    (i)     Paragraph 3(c) of the LPA provides that "*Each Limited Partner who is to make an additional subscription or receive additional Incentive Common Units or Tracking Units shall execute a Subscription Agreement **(or the equivalent thereof)**"* (emphasis added).

    (ii)    Furthermore, in relation to the Petitioners, paragraph 1 of the Ezbon Subscription Agreement and the Blue Horizon Subscription Agreement, in each case dated 1 November 2012, contemplated that the total committed capital could be increased by the LPA and the amendments thereto, and states as follows:

        "*Subject to the terms and conditions set forth in this Subscription Agreement and in the Partnership Agreement, the undersigned subscribing investor (the "Investor") agrees (a) to purchase from the Partnership a limited partner interest (the "Interest") in the Partnership, **to make a commitment to contribute capital to the Partnership in the amount set forth on the signature page below** (the "Subscription") and to contribute capital to the Partnership with respect to such commitment, **and make such other capital contributions and payments to the Partnership as***

13

45569452.2.A8559.197133

> ***provided for in the Partnership Agreement, in the manner and
> at the times provided in the Partnership Agreement****, (b) to be
> admitted to the Partnership as a limited partner of the Partnership
> and (c) to become a party to and bound by the terms of the
> Partnership Agreement as a Limited Partner.*" (emphasis added)

(iii)    Furthermore, and for the avoidance of doubt, over the course of the life of the Partnership, the Petitioners have made additional commitments to the Partnership pursuant to amendments to the LPA. These additional commitments are legally binding and until this present dispute, have always been treated as such by the parties.

(b)    As to Paragraphs 19(b) and (c) of the Petition, the GP will refer to paragraph 5(a)(ii) of the LPA (as amended) at the hearing of the Petition for its full terms and effect.

(c)    Paragraph 19(d) is admitted and it is averred that the GP has complied with all of the terms of Schedule C of the LPA in providing the Family Office with regular updates (both in person and through the provision of documents) throughout the life of the Partnership, such that the Family Office has received all relevant information concerning the Partnership and the portfolio companies on a regular and frequent basis. In particular, the GP has provided all required financial reports to the Family Office on at least a quarterly basis, and the GP met with the representatives of the Family Office on a much more regular and frequent basis than the twice-yearly meetings contemplated in Schedule C.

(d)    As to Paragraph 19(e) of the Petition, it is averred that the GP has prepared the annual budget relating to the ATLS Fee as required on an annual basis. Further, the quote from paragraph 20 of the LPA (as amended by

45569452.2.A8559.197133

Amendment No. 18 dated 5 November 2020 ("**Amendment 18**")) in Paragraph 19(e) of the Petition omits the following wording relating to the obligations of the Petitioners (defined as the Subject Limited Partner) to approve the budget, which provides in material part that, (i) if the Petitioners fail to approve the budget, the budget is deemed to have been approved within ten business days, and (ii) if the Petitioners object to a budget and the budget is not approved for a fiscal year then the approved budget for such fiscal year shall be deemed to be the most recently approved budget for a prior fiscal year.  Paragraph 20 provides as follows:

"*The General Partner shall prepare, for each fiscal year of the Partnership in advance of such fiscal year, a budget for the annual fee to be paid by the Partnership to ATLS (the "ATLS Fee"). Such budget shall be presented to the Subject Limited Partner for approval, and the Subject Limited Partner shall, within ten (10) business days of the budget being provided by the General Partner, either approve the budget or inform the General Partner that the Subject Limited Partner declines to provide such approval along with the reasons therefor. **If the Subject Limited Partner fails to so respond within such ten (10) business day period, the budget shall be deemed to have been approved.** If the Subject Limited Partner so informs the General Partner that it declines to approve the proposed budget, the Subject Limited Partner and the General Partner shall discuss in good faith any objections presented by the Subject Limited Partner to the initial proposed budget, and thereafter the General Partner shall have an opportunity to prepare a revised budget, which shall again be submitted for approval as set forth above. **If a budget is not approved for a fiscal year, then the approved budget for such fiscal year shall be deemed to be the most recently approved budget for a prior fiscal year.** In no event, however, shall the ATLS Fee be less than $8,500,000, except to the extent otherwise agreed by the General Partner. The Limited Partners shall make*

45569452.2.A8559.197133

*capital contributions to the Partnership to fund the ATLS Fee semi-annually in advance and the Management Fee annually in advance, in each case, as required by the General Partner, from time to time, in accordance with the Agreement. The amount of the ATLS Fee may also be modified from time to time by mutual agreement of the General Partner and the Subject Limited Partner. For the avoidance of doubt, the ATLS Fee shall be in addition to the Management Fee*." (emphasis added)

In the present circumstances, the GP currently calls a semi-annual budget of c.US$8.95 million in respect of the ATLS Fee, reflecting approximately half of the 2021 annual budget (being the last budget approved by the Family Office).

(e)     Paragraph 19(f) of the Petition does not fully quote section 11 of Amendment No. 9 dated 22 December 2017 ("**Amendment 9**").  Section 11 provides that, whilst certain expenses of the Partnership shall be paid from the ATLS Fee (as quoted in Paragraph 19(f) of the Petition), the Partnership shall be responsible for all other reasonable expenses of the Partnership which shall be funded by capital contributions in accordance with the LPA, including in respect of the payment of legal expenses for the Partnership, and all expenses relating to any actual or threatened litigation or proceeding involving the Partnership.  Section 11 materially states that:

"*The Partnership shall be responsible for all other reasonable expenses of the Partnership, which Partnership expenses shall be funded by capital contributions made by the holders of Preferred Units in accordance with the Agreement, including without limitation: (i) the ATLS Fee and the Management Fee, (ii) Incubation Expenses (as defined below), (iii) 50% of the fully-burdened cost of the Partnership's facilities, including rent, utilities, lessor charges, property and general liability insurance, communications, including phone and internet, and IT support, (iv) all compensation and*

16

*benefits for a fund analyst providing pharmaceutical or biopharmaceutical industry related services to the Partnership, (v) all compensation and benefits related to the Subject Limited Partner's representatives, (vi) fees and expenses of investment and other consultants, including subscription-based research consultants and databases, (vii) professional fees, including legal expenses for the Partnership (including the Partnership's in-house counsel), audit, tax compliance and tax structuring fees and expenses, (viii) all fees and expenses relating to Partnership boards, including the Advisory Boards and Executive Board, (ix) director and officer liability insurance and indemnification costs and expenses, (x) travel expenses relating to making and monitoring investments, including expenses relating to broken deals (except to the extent reimbursed by Operating Companies), (xi) all expenses related to meetings with the Subject Limited Partner, including travel, (xii) liquidation expenses, (xiv) sales or other taxes, fees and government charges which may be assessed against the Partnership, (xv) commissions or brokerage fees, finder's fees or similar charges incurred in connection with the purchase or sale of securities, (xvi) interest expenses for borrowed money (if any) and any other fees and expenses related to any Partnership credit facilities, (xvii) all expenses (including travel and travel-related expenses) relating to any actual or threatened litigation or proceeding involving the Partnership, (xviii) investment banking, commercial banking, valuation, appraisal and custodial fees expenses, and (xix) expenses associated with the preparation and delivery of the Partnership's financial statements.*"

30.    As to Paragraph 20 of the Petition, the GP will refer to the specific provisions of the LPA regarding the approval rights of the Petitioners for investments in Projects, including the provisions set out in the preceding paragraph. Specifically:

45569452.2.A8559.197133

(a)     The LPA, by Amendment No. 2 dated 15 August 2014, Schedule C, reserves to the Petitioners the right to review and approve budgets for each of the Partnership's investments in pharmaceutical, medical device and other medically related companies, projects and related activities.

(b)     As a matter of Cayman Islands law, and in light of the aforesaid, there is an implied contractual obligation and/or duty on the part of the Petitioners that their power to approve or dis-approve budgets be exercised honestly and in good faith and not arbitrarily, capriciously or irrationally or for an improper purpose.  The said obligation is implied by law and/or is required to give business efficacy to the LPA.  Further, it is consistent with the Petitioners' contractual commitments under the LPA and in the various Amendments thereto, in particular, but without prejudice to the generality of the foregoing, Amendments No. 17 dated 9 September 2020 ("**Amendment 17**"), Amendment 18, and Amendment No. 20 dated 21 June 2021 ("**Amendment 20**").

(c)     Once a budget is approved, the GP has the right to make capital calls upon the limited partners to fulfil the approved budgeted amounts and the limited partners "*shall contribute to the capital of the partnership, in such instalments as the General Partner may request, an amount equal to, but not in excess of, the total amount (if any) set forth opposite such Partner's name under the Column marked "Contingent Subscription" in the List of Partners*" (paragraph 5(a)(i) of the LPA).  A limited partner may not make less than the full amount of the required capital contribution.

31.     As to Paragraph 21 of the Petition:

(a)     It is denied that the Petitioners' total Contingent Subscriptions amount to US$2.425 billion, and it is denied that the Petitioners are only required to contribute capital up to US$2.425 billion.

45569452.2.A8559.197133

(b)     The Subscription Agreements expressly contemplated that the Petitioners' total committed capital could also be increased by the LPA and the Amendments thereto, as quoted in paragraph 30(a)(ii) above.

(c)     The Petitioners (each and both of them) have legally binding contractual commitments under the LPA (and the Amendments thereto) to fund capital to the Partnership in the combined sum of US$2,850,681,777, being their share of the total Partnership capital commitments of US$2,902,216,122 as follows:

(i)     Pools V-1 and V-2: US$1 billion, pursuant to Amendment 17 and Amendment 18;

(ii)    Pool V-3: US$310,500,000, pursuant to Amendment 20;

(iii)   Pool Braeburn: US$208,255,617, pursuant to Amendment 20; and

(iv)    Pool IV: US$1,383,360,505, pursuant to Amendments 17, 18, 19 and 20.

32.    Paragraph 22 of the Petition is admitted save that it is denied, for the reasons set out above, that the effect of the Subscription Agreements was to limit the Petitioners' total capital commitments to the amounts set out therein.

33.    Paragraph 23 of the Petition is denied. The Petitioners have contributed only US$2.3 billion to the Partnership in response to capital calls.  This amount does not exceed the Petitioners' Contingent Subscription amounts under the LPA (as amended), the full amount of which is US$2,850,681,777. The Petitioners are, accordingly, obliged to contribute further capital to the Partnership under paragraph 5(a) of the LPA, in the amounts that they have committed to contribute to the Partnership.

45569452.2.A8559.197133

34.    For the reasons pleaded above, Paragraph 24 of the Petition is denied.

**C.    GROUND 1**

35.    As to Paragraph 25 of the Petition, it is denied that there are any or any objectively verifiable grounds upon which the Petitioners can properly rely to allege that they have justifiably lost all trust and confidence in the GP's ability to manage the Partnership's affairs in the best interests of the Partnership as a whole.

36.    As pleaded more fully below and as will be set out in the evidence in opposition to the Petition, each and every allegation of serious (or any) mismanagement and/or want of probity on the part of the GP in the conduct of the affairs of the Partnership (as alleged or at all), is denied.

37.    As to the specific allegations at Paragraph 26 of the Petition:

(a)    In relation to Paragraph 26(a):

(i)    The GP was entitled to issue the Capital Calls on 30 May 2025 in the total sum of US$107,103,759 and did so in accordance with the LPA.

(ii)    The Capital Calls were made for proper purposes, and issued in the best interests of the Partnership. It is denied that they were issued in breach of fiduciary duty as alleged or at all.

(iii)    It is denied that the Capital Calls were made to put pressure on the Petitioners in the manner alleged in subparagraph (a) or at all. The Petitioners were obliged to make further capital contributions as at the date of the Capital Calls, and the Capital Calls were made in accordance with budgets that had previously been agreed by the Petitioners.  Paragraphs 3 to 5 and 9 to 11 above are repeated.

45569452.2.A8559.197133

(iv)   The Capital Calls were made on 30 May 2025, bona fide and in the best interests of the Partnership, and not in the best interests of the GP and/or Dr Harrison and/or the portfolio companies, as alleged or at all.

(v)   It is admitted that the Petitioners have issued proceedings by way of writ dated 2 June 2025 in the Grand Court of Cayman, in which the Petitioners seek, wrongly, to establish that they are not obliged to pay the ~~May 2025~~ Capital Calls. The allegations pleaded in the Statement of Claim in the Writ Summons have been denied in the Amended Defence filed therein.

(b)   The GP was entitled to issue and did issue the Delaware Complaint, bona fide, in the best interests of the Partnership, in response to the Petitioners' breach of their funding obligations under the LPA.  It is denied that any of the allegations in the Delaware Complaint are unfounded and/or untruthful and/or that the same are made in order to take control of the Partnership as alleged at Paragraph 26(b) of the Petition or at all.

(b1)   Paragraph 26.c is denied. In particular:

~~(c)~~   (i)   The GP ~~is was~~ entitled to seek to impose the default charge provisions under the LPA in circumstances where the Petitioners have failed to pay the Capital Calls as they were contractually obliged to do under the LPA. The GP will refer to the Delaware Complaint at the hearing of the Petition for its full terms and effect.

~~(d)~~   (ii)   The GP, not Dr Harrison personally, has commenced the Delaware Proceedings.  It is denied that by those proceedings, Dr Harrison personally ~~seeks~~ sought to take billions of dollars of assets from the Petitioners and transfer those assets to himself personally. The

21

45569452.2.A8559.197133

global default mechanism at paragraph 5(c) of the LPA ~~has been was~~ relied upon by the GP in accordance with the LPA.  It is averred that imposing a global default charge on a defaulting partner is just one of the remedies that is available to the GP if a limited partner becomes a defaulting partner, pursuant to paragraph 5(c) of the LPA.  The GP will refer to this provision specifically at the hearing of the Petition for its full terms and effect. It is denied that Dr Harrison's contribution of capital to the Partnership is minimal in and of itself. In the premises, Paragraph 26(c) is denied.

(iii)   As pleaded at paragraph 60C(b)(iv) below, it is averred that the GP is no longer seeking to impose the global default charge on the Petitioners in the Delaware Proceedings.

(d1)   Paragraph 26.d is denied. In particular:

~~(e)~~   (i)   It is denied that the GP has sought to compel the Petitioners to make further contributions to the Partnership's portfolio companies beyond those which the Petitioners are obliged to make under the LPA and/or has sought to make accelerated capital calls and/or unbudgeted capital calls without complying with its obligations under the LPA as alleged at Paragraph 26(d) or at all.

~~(f)~~   (ii)   Further, it is denied that by issuing the Delaware Proceedings the GP is acting or has acted in breach of its fiduciary duties to act in good faith in the interests of the Partnership as a whole and/or is acting, clearly or otherwise, out of self-interest and/or has exercised its powers for an improper purpose, as alleged in Paragraph 26(d).

(f1)   For the reasons in paragraphs 69A and 69B below, Paragraph 26.d1 is denied.

45569452.2.A8559.197133

(f2)   For the reasons in paragraphs 69C to 69H below, Paragraph 26.d2 is denied.

(f3)   For the reasons in paragraphs 69I to 69K below, Paragraph 26.d3 is denied.

(f4)   For the reasons in paragraphs 69L and 69M below, Paragraph 26.d4 is denied.

(g)    The GP has properly charged its expenses to the Partnership in accordance with the LPA and has provided all material information to the Petitioners, upon request, in a timely manner.  The information that has been provided to the Petitioners has been sufficient to enable the Petitioners to determine whether to approve further budgets for portfolio companies and/or to scrutinise expenses.  It is denied that any expenses have been improperly charged to the Partnership and in the premises, Paragraphs 26(e) and (f) are denied. Moreover, as with the other fabricated allegations that the Petitioners claim underpin their supposed loss of trust and confidence, the Family Office's allegations in relation to expenses have been made for the first time, in a business relationship that has lasted from 2011 to the present, with the filing of a Petition designed to allow the Family Office to escape its contractual obligations.

(h)    The deletion in paragraph 26.g is noted. It is denied that the GP has failed to act in the best interests of the limited partners as a whole ~~by exposing the Partnership to open-ended, binding commitments to the portfolio companies and/or~~ in seeking to compel the Petitioners to provide further funding to the portfolio companies against their wishes and/or in breach of the LPA as alleged at Paragraph 26.~~(f)~~ g or at all. It is denied that the GP's decision making, by Dr Harrison, is or has at any material time been infected by a conflict of interest.  Furthermore, Dr Harrison is and has been a director of each portfolio company of the Partnership since each company's inception, in order to best protect the interests of the

23

45569452.2.A8559.197133

Partnership.  The Petitioners have not previously made any complaint in relation to Dr Harrison serving as a director of the portfolio companies.  It is denied that this means that the GP is "*infected by a conflict of interest*". This is a fabrication made for the Petition for the purposes of avoiding the contract the Petitioners signed, and under which the parties have operated since 2012.  During this 14-year period, the GP, acting on behalf of the Partnership, has entered into innumerable contracts and investments (in respect of which the GP has managed numerous exits and value inflection points).  All of these have been done with full transparency and alongside highly frequent meetings with the Family Office and Dr Rybolovlev (by way of illustration, for the period dating from January 2020 until May 2025, Dr Harrison and the Family Office have had approximately 170 meetings in person or by Zoom) and such allegations have never before been made. Dr Harrison has always acted in the best interests of the Partnership, representing the Partnership's interests in the portfolio companies.  In the premises, Paragraph 26(g) is denied.

### **Background to the alleged loss of trust and confidence**

38.   The first sentence of Paragraph 27 of the Petition is admitted.  As to the second sentence, the full extent and manner of the agreement as regards approval of budgets is set out in the LPA.  The final sentence of Paragraph 27 is admitted.

39.   It is denied that from 2021 or at any time that the GP has improperly charged the employee costs of ATP investment professionals to the Partnership portfolio companies as pleaded at Paragraphs 53-56 of the Petition, which are responded to below.  In the premises, Paragraph 28 of the Petition is denied.

40.   Save that it is averred that in September 2023, Ezbon and Blue Horizon requested a distribution of assets in the Pool Braeburn investment pool, in breach of the LPA, the first sentence of Paragraph 29 is denied. As to the second sentence, Pool

45569452.2.A8559.197133

Braeburn has only existed since Amendment 20 dated 21 June 2021. The assets comprising Pool Braeburn have sat within the Partnership since 2012. Prior to the creation of Pool Braeburn, the Braeburn assets sat within Pool ATP IV.  Dr Harrison had repaid the capital loan referred to at paragraph 24(b) above in its entirety by the time Amendment 20 was entered into, with the result that Dr Harrison and Les Pommes did contribute capital to the assets which now form part of Pool Braeburn. It is further averred that Dr Harrison/Les Pommes and Ms Batarina hold 4.5% and 3% respectively of the profits participation in Pool Braeburn through their carry entitlements. The terms and conditions of Amendment 20 to the LPA will be referred to at the hearing of the Petition. Save that it is admitted that the Subject Limited Partner demanded the distribution of assets in Pool Braeburn, it is denied that it was entitled to make such demand in accordance with the terms of the LPA and specifically Amendment 20 thereof.  Save as aforesaid, Paragraph 29 of the Petition is denied.

41.     As regards Paragraph 30 of the Petition, it is denied that the GP acted improperly in the manner alleged or at all and/or that the GP made any threats with regard the financial position of the Partnership. The demand for distribution was made in circumstances in which a loan between Braeburn (as borrower) and Hercules Capital Inc (as lender) ("**Hercules**") (the "**Hercules Loan**") was essential for the survival and success of Braeburn, and would not be completed if the distribution proceeded.  The GP also had serious and well-founded concerns that making the distribution would result in the Family Office failing to meet its contractual obligations to meet capital calls to fund the Partnership, and would therefore be against the best interests of the Partnership. Moreover, the GP had serious and well-founded concerns that the distribution would not be consistent with the internal policies of Braeburn (a further condition precedent to the distribution of the Braeburn assets). These conditions were agreed to by the Petitioners in Amendment 20 of the LPA, as part of the term permitting it to request the

45569452.2.A8559.197133

distribution; the distribution right was never unconditional, and the Petitioners' distribution requests did not satisfy the conditions under the LPA.

42.     Save that it is averred that the GP, lawfully and properly, in accordance with the terms of the LPA, refused to distribute the assets of Braeburn upon this further request to do so by the Petitioners, Paragraph 31 of the Petition is admitted.

43.     Paragraph 32 of the Petition is denied, save that it is admitted and averred that:

(a)     The grounds relied upon by the GP in refusing to distribute the Braeburn assets were proper and lawful, and in accordance with the LPA.

(b)     The GP's duties under the ELP Law (as defined in the LPA) and/or the internal policies of Braeburn prevented the transfer of ownership of Braeburn from the Partnership to the Petitioners at that the relevant time and in the circumstances.  In particular:

(i)     any transfer of Braeburn assets would have triggered a default under the Hercules Loan and would have had a negative impact on the Partnership;

(ii)     the transfer was not possible as the shares in Braeburn were pledged to Hercules and physically held by the Partnership's attorneys as escrow agents, and were not capable of being distributed;

(iii)     a tax withholding obligation on Braeburn of circa US$240 million would have been triggered, and in circumstances in which it held circa US$62.7 million in cash would mean it would be insolvent and at risk of Chapter 11 Bankruptcy;

45569452.2.A8559.197133

(iv)     there was a risk of triggering filing requirements with the Committee on Foreign Investment in the United States ("**CFIUS**"), an interagency regulatory body that reviews foreign investments in US businesses. If such a CFIUS filing was required, it may have jeopardised Braeburn's business operations at a critical time, and also risked the Partnership's ability to attract investment in other portfolio companies; and

(v)     in circumstances in which the Family Office has indicated it may not meet its obligations to approve new budgets or comply with future capital calls, it was not in the best interests of the Partnership as a whole to distribute its largest asset without assurances the Petitioners would comply with their contractual obligations.

(c)     The Partnership was the sole shareholder of Braeburn at the time of the Braeburn Proceedings and Dr Harrison was chairman of the Board of directors of Braeburn.

44.     It is denied as asserted in Paragraph 32 that Dr Harrison exercised a significant influence over the other directors and members of senior management in Braeburn.  The Board of Directors of Braeburn comprises Dr Harrison (Chairman of the Board), Mike Derkacz (President & CEO), Dennis H. Langer, Patrick J. Kennedy, Jerry Karabelas, and Joseph Yanchik.  Mr Langer and Mr Kennedy are independent directors with no other affiliations to the GP or Dr Harrison. Mr Kennedy is a retired politician and mental health advocate, having served as a Democratic member of the United States House of Representatives from 1995 to 2011 (including serving on various House committees). In 2017, he was appointed by the President of the United States to serve as a member of the Opioid and Drug Abuse Commission. He is a co-founder of One Mind, a mental health nonprofit organisation. Mr Karabelas is a highly experienced pharmaceutical executive who previously ran Novartis Pharmaceuticals and founded Care Capital LLC.  Although

45569452.2.A8559.197133

he previously worked for ATP, he retired in 2022 and has received no remuneration from ATP since that time.  It is the practice at Braeburn for Dr. Harrison and Mr. Yanchik (who works for ATP) to be recused from any votes in which their affiliations with ATP could present an actual or perceived conflict of interest.

45.     It is denied, to the extent that it is averred, that Dr Harrison implemented arrangements such that the event of default provisions in the Hercules Loan were put in place for the purposes of avoiding distributing Braeburn to the Petitioners. The Hercules loan was not only approved by the Family Office, but was put in place because the Family Office wanted Braeburn to find alternative sources of funding for the launch of Braeburn's flagship product (Brixadi) outside of the Partnership. The Family Office was fully involved in the negotiation and finalising of the loan documents (noting that a deal with another lender had previously fallen through because of Braeburn's connection with Dr Rybolovlev and the perceived risks of investments with a connection to Russia).

46.     As to Paragraph 33 of the Petition:

(a)     The GP will refer to the Settlement Agreement at the hearing of the Petition for its full terms and effect.

(b)     The Settlement Agreement was entered into by the Parties without any admission as to liability on the part of either party and by way of compromise of the Braeburn Proceedings.

(c)     Further to the Settlement Agreement, Amendment No. 22 to the LPA dated 20 December 2024 ("**Amendment 22**") was agreed, the parties having resolved their disagreement and with the intention of continuing the successful operation of the Partnership. The relationship of the parties at the date of the Braeburn Settlement had not broken down and the parties

28

evinced a clear intention, by entering into Amendment 22, of continuing their relationship.

47.    In the premises, it is denied, contrary to Paragraph 34 of the Petition, that the relationship between the GP and the Petitioners has since "*continued to deteriorate substantially*" and/or that there has now been a complete loss of any trust and confidence of the Petitioners in the GP's operation and management of the Partnership.  The GP avers that the Family Office no longer wishes to abide by its funding commitments to the Partnership, and is attempting to pick and choose the specific portfolio companies that the Family Office wishes to fund, thereby assuming the GP's responsibility for managing the Partnership to itself, in breach of the terms of the LPA.

48.    In this regard, the GP avers that paragraph 2(b) of the LPA – which has not been amended in any of the 22 amendments to the LPA – provides that "*Control.  The management, policies and control of the affairs, and the conduct of business, of the Partnership shall be vested exclusively in the General Partner*."

49.    Paragraph 35 is denied.  As is set out in the following paragraphs in more detail, the GP's actions with regard to these ~~early stage portfolios~~ Early-Stage Companies have all material times been in accordance with the LPA and bona fide, in the best interests of the Partnership.

50.    As to Paragraph 36:

       (a)    It is admitted that Dr Harrison is a director of each of the Early-Stage Companies.  It is averred that the board of directors for each of the Early-Stage Companies includes individuals other than Dr Harrison.

       (b)    It is denied, if it is averred, that the GP has insisted on continuing to invest in the Early-Stage Companies otherwise than bona fide, in accordance with the LPA and in the best interests of the Partnership. The fact that the

45569452.2.A8559.197133

Petitioners might claim, for the convenience of the Petition, or otherwise to consider them to be hopeless investments (i) does not make them hopeless investments and/or (ii) does not make such investments a breach of the LPA and/or investments to which the Petitioners are not required to contribute under the LPA and/or (iii) does not place the GP in breach of its fiduciary duties and/or in breach of the LPA in continuing to pursue such investments.  By refusing to meet the Capital Calls in relation to these investments, the Petitioners have breached their funding obligations under the LPA.

(c) In an email dated 15 May 2025 (the "**15 May 2025 Email**"), the Family Office announced that it no longer intended to be bound by its commitments under Paragraph 5(a) of the LPA and had no intention to commit required capital to the Partnership, even in response to capital calls on approved budgets, including for the Early-Stage Companies and Clinical-Stage Companies with uncalled budgeted amounts.

(d) Furthermore, each of the Capital Calls, including in respect of Deep Apple, Red Queen, Marlinspike, Aethon, Replicate and the other Early-Stage Companies was made in accordance with budgets already approved by the Petitioners.  The Capital Calls called approximately 45% of the available budget that the GP was entitled to call on behalf of the Partnership, and were in respect of funds that the Partnership and the portfolio companies required in order to operate and were made in accordance with the LPA. The Petitioners are obliged to meet the Capital Calls. It is averred that Dr Harrison and Les Pommes were also obliged to make contributions in respect of the Pool V-3 companies pursuant to the Capital Calls, and have made those contributions to the Partnership by the due date for payment of the Capital Calls.

45569452.2.A8559.197133

(e)    The Petitioners were required to make contributions to meet the Capital Calls no later than 13 June 2025 (and by 16 June 2025 for Replicate).  The Petitioners have failed to do so, placing them in default under the LPA.

(f)    The GP is entitled to the relief claimed in the Delaware Complaint.

51.    As regards the alleged milestones in the agreed budgets for these investments pleaded at Paragraph 36 of the Petition:

(a)    It is denied that any capital calls are tied to the satisfaction of any milestones as alleged or at all, unless milestones are specifically incorporated into a budget approval. For the avoidance of doubt, milestones were incorporated into a budget approval only twice in the entire history of the Partnership.

(b)    In accordance with the terms of the LPA as amended from time to time, the operation of the ~~Fund~~ Partnership depends on the timely contributions of limited partners in response to capital calls made in accordance with approved budgets, together with the approval of new budgets for portfolio companies that are making good progress but have exhausted the funds from their initial budgeted investments.

(c)    The LPA, by Amendment 2, Schedule C, reserves to the Petitioners the right to review and approve budgets for each of the Partnership's investments in pharmaceutical, medical device and other medically related companies, projects and related activities.

(d)    Paragraph 30 above is repeated as to the Petitioners' obligations in approving budgets for the Partnership's portfolio companies.

(e)    For the avoidance of doubt, the LPA does not require capital calls to be tied to the satisfaction of specific or any milestones. The calling of capital for

31

45569452.2.A8559.197133

approved budgets is entirely in the GP's discretion as general partner, save that where the GP, as general partner, requests an acceleration of capital, the LPA requires the GP to represent a good faith belief that the Project (or portion thereof to be covered by the budget) shall be completed within the aggregate amount budgeted therefore and to provide the Petitioners with a "r*easonably detailed and diligenced presentation supporting such representation*".

(f)     Until May 2025, the aforesaid procedure for budgeting was repeatedly and successfully facilitated through extensive quarterly reporting procedures and discussions and multiple meetings between the parties, including, on many occasions, with subject matter experts and portfolio company management representatives.

(g)     Further, until May 2025, the Petitioners never objected to meeting a capital call on the grounds that a portfolio company had missed an alleged milestone, and milestones were never incorporated into the budgets, as approved (with the exception of Replicate, as mentioned in paragraph 53(b) below).  Any imposition of a condition for payment that certain milestones should be met would be inconsistent with how biotech and pharmaceutical research and development takes place, throughout the industry.  At the time of a capital call and over the course of dealings at the Partnership, a portfolio company might be ahead or behind or meeting any alleged milestones that were developed between the general partner and the company as an initial roadmap, or that were included in an investment memorandum accompanying an initial budget request.  For this reason, the LPA does not include the satisfaction of milestones as a condition precedent to capital calls on contributions for companies with approved budgets, which as stated above, are and were at all times in the GP's discretion, as general partner.

45569452.2.A8559.197133

52.   As to Paragraph 37(a) of the Petition:

(a)   The GP will refer to provisions of the LPA, to the Amendments thereto, and to the Subscription Agreements with regard to the proper calculation of the Petitioners' capital commitments thereunder.

(b)   The Petitioners have contributed US$2.3 billion to the Partnership in response to capital calls. This amount does not exceed the Petitioners' Contingent Subscription amounts under the LPA (as amended), the full amount of which is US$2,850,681,777.

(c)   In this regard, the GP will refer to Amendments 17, 18 and 20 to the LPA, pursuant to which the Petitioners contractually agreed to commit further capital to the Partnership. As stated above, the Petitioners are legally committed to contribute US$2,850,681,777, a sum significantly in excess of the US2.3 billion which the Petitioners admit they have contributed to date.

(d)   In the premises, it is denied that the Petitioners are not obliged to fund the Early-Stage Companies as alleged or at all.

53.   As to Paragraph 37(b) of the Petition:

(a)   As pleaded above, the budgets approved by the Petitioners do not provide for funding against certain specified milestones, as alleged or at all.

(b)   In the premises, it is denied that the alleged milestones have to be met as alleged, before the Partnership may invest in the projects. The alleged milestones are not contractual agreements between the Partnership and the Family Office unless expressly incorporated by reference into a specific budget approval, which (with the exception of a recently approved budget

for Replicate, for which the GP made a capital call of US$4 million on 1 June 2025 that the Petitioners have refused to pay) they were not.

(c)    It is denied that the GP is seeking to call capital on an accelerated basis; the relevant budgets have been approved by the Petitioners and the Petitioners are not entitled to refuse to provide the capital required in accordance with the approved budgets and in accordance with their funding obligations under the LPA.

(d)    The GP's position is that the budgets in respect of the Capital Calls, on which the Petitioners have defaulted, have previously been approved by the Petitioners and there is no entitlement on the part of the Petitioners to refuse to provide capital in relation thereto.

(e)    In the premises, the Petitioners' purported summary of the GP's position is denied.

(f)    For the avoidance of doubt, each of the Capital Calls, which the Petitioners have refused to honour, including in respect of the Early-Stage Companies was made in accordance with budgets approved by the Petitioners and the Petitioners are obliged to meet the Capital Calls.

54.    As to Paragraph 38, save that it is admitted that Mr Yuri Bogdanov emailed the GP on 15 May 2025, the GP will rely upon the full contents of the 15 May 2025 Email at the hearing of the Petition for its full terms and effect.

55.    Save that it is admitted that the GP issued the May 2025 Capital Calls on 30 May 2025 and issued the Delaware Proceedings on the same date, Paragraph 39 of the Petition is denied:

45569452.2.A8559.197133

(a)    It is averred that the total capital contributions sought pursuant to the Capital Calls is US$107,103,759, and not "*US$109,960,926.00 million (sic)*" as pleaded in the Petition.

(b)    It is averred that the GP had no alternative but to issue the Delaware Proceedings in light of the Petitioners' clear breach of their funding obligations under the LPA and their intention, made clear in the 15 May 2025 Email, not to provide any further funding to the Partnership, in breach of their obligations under the LPA.

56.    Paragraph 40 of the Petition is not admitted. The GP will refer to the Delaware Complaint at the hearing of the Petition for its full terms and effect, by which date the Delaware Complaint will have been determined by the Delaware Court.

57.    As to Paragraph 41 of the Petition:

(a)    It is denied that the Capital Calls are designed to compel the Petitioners to pay any sum in excess of what they are legally committed and obliged to pay under the LPA, and paragraph 31(c) above is repeated.

(b)    It is denied that the GP has sought to engineer a default, as alleged or at all, thereby allowing Dr Harrison and his family trust to take control of the Partnership.  At all material times, the actions taken by the GP and/or Dr Harrison for and on behalf of the Partnership have been taken in good faith, acting bona fide in the interests of the Partnership, in the face of the Petitioners' wrongful refusal to contribute the capital they are each legally obliged to contribute under the LPA.

(c)    It is denied that Dr Harrison and Les Pommes have together contributed less than 1% of the capital in the Partnership. averred that Dr Harrison has contributed US$54.7 million to the Partnership, representing approximately 2.1% of the total capital contributed to the Partnership. In any event, the

45569452.2.A8559.197133

amount that Dr Harrison and Les Pommes have contributed to the Partnership is irrelevant.

(d)    The last sentence of Paragraph 41 is denied, if and to the extent it is suggested thereby that the GP has acted wrongfully and/or in breach of the LPA and/or otherwise than in good faith and in the best interests of the Partnership in seeking the relief it seeks on behalf of the Partnership in the Delaware Complaint.

58.    In the premises, Paragraph 42 of the Petition is denied.

59.    Paragraph 43 of the Petition is denied:

(a)    The GP is and was entitled to act in the manner it has, in the proper exercise of its discretion and in accordance with the LPA, in response to the 15 May 2025 Email. The Petitioners were fully aware and needed no further explanation from the GP as to why they were required to provide further capital.

(b)    The GP does not seek to confiscate assets, as alleged by the Petitioners. The GP is acting in accordance with terms and conditions of the LPA.

(b1)    The GP will rely on the default provisions in paragraph 5(c) of the LPA for their full terms, meaning and effect. The Petitioners' pleaded interpretation of these provisions is denied. In particular, the true position is that:

~~(c)~~    (i)    The default provisions of paragraph 5(c) of the LPA impose a global default penalty on a defaulting limited partner across all of the defaulting limited partners' interests in the Partnership. This provision has remained unaltered since the inception of the LPA in 2012, across 22 different amendments.

45569452.2.A8559.197133

~~(d)~~    (ii)    In the event that a limited partner fails to make a required capital call contribution in response to a valid capital call (which, for the avoidance of doubt, the Capital Calls were), after notice and a 30-day cure period, the limited partner is deemed a "Defaulting Partner". The LPA provides that the GP can then pursue one or more of the alternatives set out in paragraph 5(c) of the LPA, including but not limited to the imposition of a Default Charge equal to up to 50% of the defaulting limited partner's interest in the Partnership, with those interests then being distributed to non-defaulting holders of interests in the Partnership.

~~(e)~~    (iii)    Once a Default Charge has been imposed, a Defaulting Partner shall not have the right to vote on or grant or withhold consent or approval with respect to any matter, except as otherwise required by law, and any Units it may hold shall not be deemed outstanding for the purposes of determining the parties required or permitted to take any vote or action. The GP will rely on paragraph 18(f) of the LPA in this regard.

60.    As the Family Office has always been aware, the global Default Charge is and always has been an important protection for the Partnership, providing, inter alia, a guarantee of funding implicit in and afforded by the global Default Charge mechanism.  It prevents the Petitioners, as they have sought to do by their actions now, cherry picking which portions of the Partnership portfolio they fund after providing budget approvals.  The scope of the Default Charge is not limited to the Defaulting Partner's interest in a specific project for which capital is called.  Its purpose is to prevent a limited partner from reaping the benefits of self-selected Partnership assets while simultaneously ignoring obligations to meet capital calls across the rest of the Partnership portfolio. It is averred that this is precisely what the Petitioners have sought to and continue to seek to do by their present actions.

45569452.2.A8559.197133

60A.    Paragraph 43A is denied in its entirety. The GP has at all times acted in accordance with the LPA and never exerted pressure on the Petitioners, illegitimate or otherwise, to contribute capital to the Partnership that the Petitioners were not obliged to contribute. The GP has never sought to create a situation where it could default the Petitioners, or otherwise adopted the alleged "Default Strategy".  The inference in the final sentence of paragraph 43A is not supported by any of the matters pleaded in Paragraphs 43A.a-f. and is denied. Further, as to paragraphs 43A.a-f:

(a)    As to Paragraph 43A.a, any such inference is denied, and the confidential communications between the GP and its US attorneys are in any event privileged.

(b)    Paragraph 43A.b is denied. The Capital Calls were issued for proper purposes, *intra vires*, and were not inflated but reflected the funding needs of the Partnership.

(c)    As to Paragraph 43A.c, the appropriateness of the relief sought by the GP in the Delaware Proceedings is a matter for the Delaware Proceedings. Without prejudice to the aforesaid, it is denied that there was anything improper about the relief sought by the GP in the Delaware Proceedings.

(d)    As to Paragraph 43A.d, the well-foundedness of the GP's claim in the Delaware Proceedings is irrelevant.  Without prejudice to the aforesaid, it is denied that the GP's position on the true meaning of the Default provisions in the LPA was or is wrong.

(e)    As to Paragraph 43A.e, it is admitted that a reallocation plan was proposed by the GP to the Petitioners on or around 29 April 2025.  However, it is denied that this paragraph presents an accurate account of the events surrounding that plan.  It is averred that the GP made clear in

38

45569452.2.A8559.197133

correspondence with the Petitioners at the relevant time that the GP's proposal was part of a triage strategy in light of the Petitioners' starvation of the Partnership.  It was a good faith attempt by the GP to accommodate the Petitioners' funding concerns and does not support any inference that the GP acted improperly.

(i)      As to Subparagraph 43A.e.i, it is admitted that discussions took place on 9 May 2025 and 13 May 2025. However, it is denied, if alleged, that the GP's proposal was seriously considered by the Petitioners. It is averred that during the call on 13 May 2025, lawyers acting for the Petitioners repeatedly exerted pressure on Dr Harrison to concede the false position that the GP's proposal was evidence of its lack of faith in the Early-Stage Companies.  The conduct of the Petitioners and its lawyers during that call caused the GP reasonably to consider that the Petitioners did not intend to engage with the GP's proposal in good faith.

(ii)     As to Subparagraph 43A.e.ii, it is admitted that the GP withdrew the reallocation proposal during the call on 13 May 2025. It is denied that, at the time when it was withdrawn, the GP considered the proposal to be in the best interest of the Partnership. The third and fourth sentences of paragraph 60A(e) above are repeated.

(iii)    Subparagraph 43A.e.iii is denied and the allegations therein are baseless.

(f)    As to Paragraph 43A.f, it is denied, if alleged, that the GP undertook any actions in respect of an attempted sale of Partnership assets that were not in furtherance of its obligations under the LPA or that could reasonably give the Petitioners any cause for concern. It is averred that since the commencement of the Delaware Proceedings, the GP was approached by

45569452.2.A8559.197133

or approached 26 investors, including by sending a presentation relating to the opportunity to take over part of the Partnership's portfolio, with a view to remedying the damage caused to the Partnership by the Petitioners' breaches of their funding obligations under the LPA.  It is denied, if alleged, that the GP was required to give notice to the Petitioners of any such measures. None of the proposed transactions would be effected unless there is a change of circumstances in the GP's disputes with the Petitioners and/or with appropriate Court sanction.

60B.    Paragraph 43B is denied. The existence of any "default strategy" on the GP's part is specifically denied.

60C.    As to Paragraph 43C, it is denied that any amendment made by the GP to the relief sought in the Delaware Proceedings is relevant to the issues in these proceedings. The effect of the relief sought by the GP in the Delaware Proceedings is a matter of Delaware law and a matter for the Delaware Proceedings. Without prejudice to the aforesaid, it is admitted that before the trial of the Delaware Proceedings was due to commence, the GP amended the relief sought in those proceedings. Those amendments were reflected in the Proposed Pre-Trial Order dated 5 September 2025.  In addition, it is averred that further amendments to the relief sought in the Delaware Proceedings were subsequently made by the GP, as reflected in the Proposed Order and Final Judgment dated 28 October 2025. Further:

(a)    Paragraph 43C.g is not understood, but in any event is denied. The GP never claimed to be entitled to relief based "solely" on the 15 May Email. The GP's complaint as filed in the Delaware Proceedings concerns the sum of the Petitioners' wrongful conduct and the numerous breaches of their obligations owed to the Partnership.

45569452.2.A8559.197133

(b)   As to Paragraphs 43C.h-i, and strictly without prejudice to the GP's position in the Delaware Proceedings:

    (i)   The GP did not "abandon" anything but rather amended the relief sought.

    (ii)   The GP's case in the Delaware Proceedings has been (and remains) that there is approximately US$331m in capital committed by the Petitioners towards unapproved budgets.

    (iii)   Specific performance of the Petitioners' obligation to approve budget proposals within this amount was sought when the Delaware Proceedings were issued, and still at the time of the Proposed Pre-Trial Order (as alternative relief to the finding that the Petitioners had waived their rights to consider and approve budgets).

    (iv)   The GP initially claimed, but was no longer claiming at the time of the Proposed Pre-Trial Order, and is not claiming now, an order permitting it to impose a Default Charge against all of the Petitioners' interests in the Partnership or, alternatively, in the Pools implicated by their breaches.

(c)   Paragraph 43C.j is admitted and it is averred that the GP continues to claim this relief.

(d)   As to Paragraph 43C.k, and strictly without prejudice to the GP's position in the Delaware Proceedings:

    (i)   It is admitted that such declaration was sought at the time of the Proposed Pre-Trial Order.

45569452.2.A8559.197133

(ii)    However, a materially identical declaration had already been sought when the Delaware Proceedings were issued.

(iii)   No such declaration is sought now. It is averred that the only relief claimed by the GP that relates to the Default provisions in paragraph 5(c) of the LPA is a declaration that "*[t]he terms of the Global Default Provision have not been altered or amended since the execution of the First Amended LPA*".

(e)    As to Paragraph 43C.I and strictly without prejudice to the GP's position in the Delaware Proceedings:

(i)    It is admitted that such relief was sought at the time of the Proposed Pre-Trial Order.

(ii)    However, materially identical relief had already been sought when the Delaware Proceedings were issued.

(iii)   It is averred that relief currently claimed by the GP does not refer to the Petitioners' obligations specifically to fund the Early-Stage Companies but it does refer to the Petitioners' obligations to pay the Capital Calls and to fund future capital calls in accordance with approved budgets, including in so far as capital is thereby provided to the Early-Stage Companies.

60D.    The allegations in Paragraph 43D regarding the GP's conduct are all denied. It is unclear what is meant by the averment that the relief sought is "extreme" and "unjustified": accordingly, it is impossible to plead back to these averments, which are in any event denied. In any event, and without waiver of privilege, as pleaded more fully below, the subsequent amendments were made by the GP to ensure compliance with the terms of the Writ Injunction.

45569452.2.A8559.197133

60E.   Paragraph 43E is denied in its entirety.

(a)   The relief (as amended) sought in the Delaware Proceedings by the GP includes declarations that:

(i)   The Petitioners have breached the LPA by (i) refusing to consider budgets in good faith and waived their rights to approve budgets and (ii) failing to pay the Capital Calls;

(ii)   The Petitioners have breached their Common Law duties to exercise discretion in approving budgets in a rational and good faith manner;

(iii)   The GP's filing of the Delaware Complaint on behalf of the Partnership (i) does not constitute an act taken in bad faith; (ii) is not an instance of willful fraud, willful misconduct or gross negligence; nor (iii) an intentional and material breach of the LPA; and (iv) is consistent with GP's rights and obligations as set forth in LPA paragraph 18(g)(iv); and

(iv)   The Petitioners are required to pay the Capital Calls and to fund future capital calls in accordance with approved budgets.

(b)   It is denied that the recognition of the any judgment or order of the Delaware Court in the Delaware proceedings would be contrary to public policy. The GP did not breach the Writ Injunction by making the amendments to the relief sought in the Delaware Proceedings reflected in the Proposed Pre-Trial Order dated 5 September 2025 or the subsequent amendments, reflected in the Proposed Order and Final Judgment filed on date 28 October 2025, or pursuing that relief (including the relief set out above).

43

45569452.2.A8559.197133

(c)    Any judgment or order in the Delaware Proceedings, including any judgment and order making the declarations set out above in paragraph 60E(a), will be entitled to recognition in the Cayman Islands. Any such judgment or order will: (i) be given by a court of competent jurisdiction; (ii) be a final and conclusive judgment on the merits; (iii) be in proceedings between the same parties; and (iv) not be contrary to Cayman public policy.

60F.    The sub-paragraphs of 43E are all denied:

(a)    Paragraph 43E.a is denied. The Writ Injunction does not prohibit the GP from seeking any declaratory relief in the Delaware Proceedings but only restricts the GP from taking enforcement steps in the Cayman Islands that would be contrary to the terms of the Writ Injunction. In any event, it is denied that the declaration identified in this subparagraph is now sought by the GP.

(b)    Paragraph 43E.b is denied. Pursuant to paragraph 5(c)(iv) of the LPA, the GP is entitled to pursue the remedies referred to therein, including collecting unpaid capital contributions, without GP treating or designating the Petitioners as "*Defaulting Partners*". In any event, the relevant "commencement of a lawsuit" by the GP took place before the Writ Injunction was made, therefore it could not be a breach of the Writ Injunction on any construction of paragraph 5(c)(iv) of the LPA.

(c)    Paragraph 43E.c is denied. The GP has not taken a step to designate, deem or treat the Petitioners as a "*Defaulting Partner*" as alleged or at all. The GP has pursued a declaration that the Petitioners have waived their rights to approve budgets, and did so in reliance on the rules of equity recognised in Delaware law, not on the basis of paragraph 18(f) of the LPA.

45569452.2.A8559.197133

60G.    Further, should the Delaware Court make the declarations, or declarations in materially the same terms as those set out above at paragraph 60E, the Petitioners will thereby be estopped from disputing certain issues raised in this Petition. Alternatively, in so far as any of these issues were not raised in the Delaware Proceedings, this was the result of the Petitioners' failure to bring forward their whole case in the Delaware Proceedings, and it will be an abuse of process to continue to raise them in this Petition. These issues include the following:

(a)    If the Delaware Court makes the declaration at paragraph 60E(a)(i) above, the Petitioners will be estopped from disputing, or it will be an abuse of process for them to dispute, the following issues:

(i)     Whether the Petitioners were obliged to pay the Capital Calls (Paragraphs 4.a, 26.a, 37.b, 44A-44D, 47).

(ii)    Whether the GP has sought to compel the Petitioners to provide funding to the Partnership in excess of the total amount of their Contingent Subscriptions (Paragraphs 4.a, 21-24, 37.a, 47, 49).

(iii)   Whether the GP has failed to enable the Petitioners to consider budgets by failing to provide information required by them for this purpose (Paragraphs 26.f, 57-58).

(iv)    Whether the GP, by misleading the Petitioners, has interfered with their consideration of budgets (Paragraphs 4.b1, 26.d1, 52A-52I).

(v)     Whether the Petitioners have waived their right to approve budgets (Paragraphs 37.b, 52).

(b)    If the Delaware Court makes the declaration at paragraphs 60E(a)(ii) above, the Petitioners will be estopped from disputing, or it will be an abuse of process for them to dispute, the following issues:

45

(i)    Whether the GP has sought to compel the Petitioners to provide funding to the Partnership in excess of the total amount of their Contingent Subscriptions (Paragraphs 4.a, 21-24, 37.a, 47, 49).

(ii)   Whether the GP has failed to enable the Petitioners to consider budgets by failing to provide information required by them for this purpose (Paragraphs 26.f, 57-58).

(iii)  Whether the GP, by allegedly misleading the Petitioners, has obstructed their consideration of budgets (Paragraphs 4.b1, 26.d1, 52A-52I).

(c)   If the Delaware Court makes the declaration at paragraph 60E(a)(iii) above, the Petitioners will be estopped from disputing, or it will be an abuse of process for them to dispute, the following issues:

(i)    Whether there was any impropriety in the GP's issuing the Delaware Proceedings (Paragraphs 4.b, 26.b-d, 41-43D, 45, 48-49A).

(ii)   Whether there was any impropriety in how the GP conducted itself in the Delaware Proceedings (Paragraph 49B).

(iii)  Whether there was any impropriety in how the GP has funded the Delaware Proceedings (Paragraph 52N.f).

(d)   If the Delaware Court makes the declaration at paragraph 60E(a)(iv) above, the Petitioners will be estopped from disputing, or it will be an abuse of process for them to dispute, the following issues:

(i)    Whether the Petitioners were obliged to pay the Capital Calls (Paragraphs 4.a, 26.a, 37.b, 44A-44D, 47).

45569452.2.A8559.197133

(ii)    Whether the Petitioners have any remaining funding obligations according to their total Contingent Subscriptions (Paragraphs 4.a, 21-24, 37.a, 47, 49).

(iii)    Whether there are any reasons, such as relating to conflict of interest, why the Petitioners should not be required to fund future capital calls (Paragraphs 4.d, 26.g, 59-62).

60H.    The GP reserves the right to contend that other issues were raised and determined by the Delaware Court in the Delaware Proceedings by the Petitioners, or should have been raised, such that the Petitioners are estopped from disputing those issues, or that it would be an abuse for the Petitioners to dispute them.

**Alleged mismanagement/prejudicial conduct/lack of probity in the conduct of the Partnership's affairs**

61.    Paragraph 44 of the Petition is denied.

**Issuing of the Capital Calls**

61A.    Paragraph 44A is admitted, and it is averred that the GP acted at all times in good faith in the best interests of the Partnership, and exercised its powers for a proper purpose.

61B.    As to paragraph 44B, it is admitted that the GP is required to have regard to the interests of the Partnership in complying with the duties referred to in paragraph 44A. It is denied, if it is averred, that the relative amount of the Petitioners' contribution of capital to the Partnership requires the GP to have specific regard to the interests of the Petitioners, to the exclusion of the other limited partners, when discharging its duties.

45569452.2.A8559.197133

61C.    Paragraph 44C and each and all of Paragraphs 44C.a-d pleaded in support thereof are denied. It is denied that the Capital Calls were not made in good faith, were not made in the interests of the Partnership or were made for improper purposes, whether as alleged or at all. It is denied the GP did not genuinely believe that it was in the best interests of the Partnership to allocate further funding to the Early-Stage Companies either in the amounts sought under the Capital Calls, or at all. It is averred that the GP issued the Capital Calls to meet the Portfolio Companies' funding needs, pursuant to budgets previously agreed with the Petitioners, at all times acting in good faith and for a proper purpose.

61D.    Paragraphs 44D and its sub-paragraphs are denied:

(a)    It is unclear what is meant by "*enormous economic benefits*" and so it is impossible for the GP to plead back to this averment. Nevertheless, it is denied that the GP was actually or potentially subject to a conflict of interest as alleged at Paragraph 44D.a or at all. It is specifically denied that the entitlements and matters set out at 44D.a.(a)-(c) give rise to any such actual or potential conflict. Further, those entitlements and matters were in any event permitted under the LPA and were fully disclosed to the Petitioners who never objected to and consented to them. Accordingly, if which is denied, there was any such actual or potential conflict, the same was fully disclosed and consented to by the Petitioners, and the GP has not breached any duty, as alleged or at all.

(b)    As to Paragraph 44D.b, it is admitted that the Capital Calls were all made on the same day. It is denied, if alleged, that the GP was obliged to provide any additional explanation to the Petitioners prior to issuing them, in circumstances where the Petitioners were well aware of the basis on which they were obliged to contribute capital as per their obligations under the LPA and pursuant to budgets agreed with the Petitioners, and the same had been previously explained by the GP.

45569452.2.A8559.197133

(c)      As to paragraph 44D.c, the size of the Capital Calls is US$107 million. This amount reflected the genuine funding needs of the relevant Portfolio Companies. Without prejudice to the aforesaid, it is averred that statements made in April 2025 and in the 15 May Spreadsheet reflected the GP's austerity strategy, in an attempt to accommodate the Petitioners in good faith negotiation to provide the bare-minimum funding to the portfolio companies.  As to the October Presentation, whilst the Capital Calls were based on the funding needs of the Portfolio Companies by reference to the amounts that the GP was permitted to call pursuant to the LPA, the October Presentation set out revised amounts in relation to these specific Portfolio Companies in light of the reduced company costs following the considerable number of redundancies and restrictions to ongoing business operations that were required to be implemented across the Portfolio Companies as a result of the Petitioners' failure to pay the Capital Calls.

(d)     Paragraph 44D.e is denied for the reasons set out at paragraph 60A above.

(e)     As to paragraph 44D.f, it is denied that the timing of the Capital Calls could support the conclusion that the GP breached its duties, as alleged or at all.

(f)      As to paragraph 44D.g, despite Apertor's financial situation, which was caused by the Petitioners' breach of their funding obligations, the GP rightly considered that Apertor's shutdown at the time when the Capital Calls were issued was not in the best interest of the Partnership. The Capital Call in respect of Apertor reflected that position and corresponded to the Apertor's genuine commercial need.

(g)     As to paragraph 44D.h, it is averred that the deal with Novo Nordisk did not provide enough funding to satisfy all Deep Apple's funding needs, was not concluded until June 2025, and the first funding pursuant to it was not

45569452.2.A8559.197133

received until late July 2025. There is no basis for the inference pleaded in Subparagraph 44D.h.iv.

(h)     As to paragraph 44D.i, paragraph 60A(e) is repeated. The communications between Dr Harrison and Ms Batarina referred to were by WhatsApp, not email. Dr Harrison's assertion to Ms Batarina that the reallocation of capital away from the Early-Stage Companies "*is the right business decision for the portfolio in ANY financing context*" was made specifically in the context of the reallocation proposal, a triage strategy to save the portfolio companies in light of the starvation of funding from the Petitioners. Furthermore, at the time of the messages with Ms Batarina (April 2025), the GP did not contemplate that the Petitioners would cease discussions of budgets completely. The GP will rely upon the complete text of the WhatsApp communications with Ms Batarina to demonstrate that the GP was working on the basis there would be a flexible, ongoing dialogue between the Petitioners and the GP as to portfolio-wide capital calls, budgets and programmes. Accordingly, there is no basis for the inference pleaded in Subparagraph 44D.i.iii.

### The Delaware Proceedings

61E.    The GP will rely on the transcripts of the Delaware Proceedings, and the pleadings filed in those Proceedings, for their full terms and effect.

62.     It is denied that the Delaware Proceedings were issued by the GP for any or the alleged improper reason pleaded at Paragraph 45 of the Petition.  Further, as the Petitioners are well aware, no consensual solution was possible, in light of the Petitioners' stated intention not to provide any further capital.  The purpose of the

45569452.2.A8559.197133

Delaware Proceedings is to compel the Petitioners to abide by their contractual obligations pursuant to the LPA and holding the Petitioners to the agreed bargain.

63.    As to Paragraph 46, the GP will refer to the Delaware Complaint at the hearing of the Petition for its full terms and effect.

64.    It is denied that the allegations particularised at Paragraph 46 are untruthful and/or wholly unfounded as alleged at Paragraph 47 of the Petition.  As pleaded above:

(a)    The Petitioners have not paid out the entirety of their legally committed capital under the LPA (as amended), as alleged or at all.

(b)    The relevant budgets in relation to the Capital Calls had been approved and there were not and are not any milestones to be met therein.

(c)    The Capital Calls are in accordance with the approved budgets and the Petitioners are obliged to pay the same.

(d)    It is denied that the Early-Stage Companies are obliged to and/or have failed to meet any requisite milestones, as alleged or at all.

(e)    The fact that the Petitioners have purportedly formed the view that the Early-Stage Companies are not viable investments is irrelevant in the circumstances. As pleaded above, paragraph 2(b) of the LPA vests exclusive control of the management, policies and control of the affairs, and the conduct of business, of the Partnership in the GP.

(f)    Furthermore, the GP avers that the Petitioners do not, in fact, believe that the Early-Stage Companies are not viable investments, but have adopted this position in support of their own self-serving agenda and in abrogation of their contractual and extra-contractual duties.

45569452.2.A8559.197133

(g)     The GP has provided the Petitioners with all relevant information with regard to new budgets, but the Petitioners have refused, irrationally and in breach of the LPA, to agree the budgets.

65.     Moreover, the GP avers that the Family Office is currently experiencing liquidity issues.

66.     In the premises, Paragraph 48 of the Petition is denied.

67.     Paragraph 49 of the Petition is denied, for the reasons pleaded above, which are repeated seriatim.

67A.    The Petitioners' position at paragraph 49A is noted. Paragraph 60D above is repeated.

67B.    As to Paragraph 49B, it is denied that the GP's conduct in the Delaware Proceedings is an issue relevant to the Petition. Further and in any event: (i) it is denied that the GP's conduct in Delaware has given rise to a justifiable loss of trust and confidence; (ii) it is denied that the making of submissions to a Court of competent jurisdiction in proceedings to which the Petitioners were party and afforded an opportunity to respond is capable of giving rise to a justifiable lack of trust and confidence; and (iii) it is denied the GPs made any misrepresentations to the Delaware Court.  Without prejudice to the aforesaid:

(a)   Paragraph 49B.d is admitted.  The Petitioners subsequently abandoned   the JPL Summons.

(b)   Paragraph 49B.e is admitted and it is averred that this motion was the Emergency Motion for Status Quo Order.

(c)   Paragraphs 49B.f-g raise issues which could have been raised by the Petitioners in the Delaware Proceedings. The issues were not raised by the

45569452.2.A8559.197133

Petitioners in the Delaware Proceedings, including either at the *inter partes* September Hearing, or in their Answering Brief to the GP's motion. Their attempt to raise these issues now is an abuse of process of this Court. Without prejudice to the aforesaid, the allegations in Paragraphs 49B.f-g are denied. The status quo motion was not pursued in breach of the LPA paragraph 18(g)(vi), nor was it vexatious or oppressive to the Petitioners, nor was it an interference with the Cayman Court's winding up jurisdiction, nor was it unconscionable.

(d)    Further and in any event, it is denied that the GP misrepresented any matters to the Delaware Court at the September Hearing, as alleged or at all.  In particular:

(i)    The same allegation as pleaded at Subparagraph 49B.h.i was also made by the Petitioners at the September Hearing in the Delaware Proceedings. Chancellor McCormick interrupted the Petitioners' attorney and said "*Skip that point because it's a bad one. I read the letter the same way [the GP] did … That sounds like* ex parte *relief to me. I understand why [the GP] took it that way. I'm glad to hear you're not doing that.*"

(ii)    The Delaware Court considered that the JPL Summons risked an interference with its jurisdiction, contrary to the Petitioners' position at Subparagraph 49B.h.ii. Chancellor McCormick said: "*[The GP] said that the goal [of the adjournment in Delaware] was … to give you an opportunity to push Cayman proceedings forward. So, yeah, I think they were on to something. That's exactly what is seems like happened. … So had I known this would have been the case, I probably wouldn't have adjourned the trial that was set to go forward yesterday and today.*"

53

45569452.2.A8559.197133

(iii)      As to Subparagraphs 49B.h.iii-vi, it is denied that the GP misrepresented anything to the Delaware Court in connection with its motion, either as alleged or at all.

(e)      Paragraph 49B.i is admitted.

(f)      Paragraph 49B.j is admitted, save that it is denied (to the extent alleged) that there was anything improper in the GP suggesting that the Delaware Court hand down judgment before the JPL Summons was due to be heard on 3 November 2025.

(g)      Paragraph 49B.k is denied. The Petitioners chose to have their JPL Summons dismissed because it was bound to fail. It is in any event denied that their reasons for doing so are relevant to the Petition. If and insofar as the Petitioners allege that Chancellor McCormick's management of the Delaware Proceedings and their timescale caused the Petitioners not to obtain a fair trial, that is denied.

**Alleged wilful and persistent breaches of the LPA**

68.    The GP will refer to the Delaware Complaint at the hearing of this Petition for its full terms and effect. ~~The facts and matters pleaded in~~ Paragraphs ~~50 to~~ 52 ~~inclusive~~ of the Petition ~~are~~ is embarrassing for want of particulars and is too vague for the GP to plead back to, but is in any event denied. The GP is not seeking any relief in the Delaware Proceedings to which it is not entitled as a matter of law or equity.

~~69.~~    ~~As to the allegation that the GP is attempting to derive the Petitioners of "oversight", paragraph 18(f) of the LPA provides that "~~*a Defaulting Partner shall not have the right to vote on or grant or withhold consent or approval with respect to any matter, except as may otherwise be required by law.*~~" The provision is automatic where a partner becomes a Defaulting Partner and is not dependent on~~

45569452.2.A8559.197133

~~the GP exercising any discretion. The Delaware Complaint seeks a judicial determination that paragraph 18(f) is engaged. It is denied that the GP seeking to enforce an express term of the LPA demonstrates a lack of probity and/or mismanagement.~~

**Alleged misleading of the Petitioners into contributing capital to the Partnership**

69A. The allegation at Paragraph 52A is embarrassing for want of particulars, but in any event is denied. It is denied that the GP misled the Petitioners, or made false representations, or alternatively that it did so knowingly, as alleged or at all.

69B. As to Paragraphs 52B to 52I:

(a) It is admitted that capital calls in respect of Marlinspike were made and paid as pleaded.

(b) It is admitted that a loan of US$1 million was made by Marlinspike to Nereid.

(c) The loan was made by Marlinspike, not by the GP. It was made within the proper authority and power of Marlinspike.

(d) It is denied that the GP breached its obligations under the LPA or made any misrepresentations to the Petitioners:

(i) At the time when the loan was made, the GP and the Petitioners anticipated that a merger would take place between Marlinspike and Nereid, and which would be in the Partnership's best interest.

(ii) The Petitioners had agreed to that merger, including in January 2025, and by the time when the loan to Nereid was made.

45569452.2.A8559.197133

(iii)    The loan was made to promote the objectives of that merger and without prejudice to the interests of Marlinspike or the Partnership generally.

(iv)    In the circumstances, it is denied that the GP represented by virtue of the Capital Calls, that the capital sought would not be used by Marlinspike to make loans or that Marlinspike would not loan the capital sought to Nereid.

(e)    Save as admitted above, the allegations in Paragraphs 52B to 52I are denied.

**Alleged misappropriations / dissipations of assets**

69C.    Paragraph 52J is admitted.

69D.    Paragraph 52K is admitted, save that management fees paid to ATLS are not *"alleged"* but were properly due and payable.

69E.    The first and second sentences of paragraph 52L are contradictory. The first is denied. As to the second:

(a)    The Petitioners became aware that US$20,035,952.54 was received on 31 July 2025 (in respect of an earnout payment in respect of an exit from Tendyne, an older investment of the Partnership) because the GP disclosed this fact, voluntarily, in correspondence in the weeks after it received it. Further, as regards the Braeburn Prepayment, the Petitioners knew (or ought reasonably to have known) that it would occur since at the latest July 2025, when they were copied to correspondence regarding it.

(b)    The GP was not under any obligation to disclose the Q3 2025 Payments to the Petitioners earlier than it did.

45569452.2.A8559.197133

69F.    The first sentence of Paragraph 52M is admitted. The second sentence is denied. It is denied that by obtaining the Braeburn Prepayment the GP demonstrated any lack of probity, or that the Braeburn Prepayment gives rise to any justifiable loss of trust or confidence in the GP's management of the Partnership. The GP chose to forgo a portion of the capital and interest on the Braeburn Notes where the alternative was the collapse of portfolio companies due to the Petitioners' breach of their funding obligations. Without prejudice to the aforesaid:

(a)    Paragraph 52M.a is denied. The Braeburn Prepayment represented an early repayment of sums owed to the Partnership under certain convertible loan notes issued by Braeburn between October 2020 and February 2021 (as amended on a number of occasions, most recently on 29 September 2023).

(b)    Paragraph 52M.b is denied. The Braeburn Notes were originally forecast to be repaid in Q4 of 2025 (of which the Petitioners were well aware and as has been discussed on numerous occasions between the GP and the Petitioners). Following various issues related to government funding, which affected Braeburn's profit forecast for 2025, the forecast for the date of repayment of the Braeburn Notes was adjusted to Q4 of 2026.

(c)    Paragraph 52M.c is admitted.

(d)    It is averred that the GP offered the discount to Braeburn as pleaded at Paragraph 52M.c on 24 July 2025. Braeburn calculated that it would save US$4.7 million in interest payments as a result of the 10% discount.

(e)    For the reasons above, Paragraphs 52M.d-e are denied.

69G.    Paragraph 52N is denied. The Q3 2025 Payments were made by the GP properly in accordance with paragraph 8(c) of the LPA. As to its sub-paragraphs:

45569452.2.A8559.197133

(a)    On the true construction of the LPA, including paragraph 21 thereof, the GP was permitted to use the proceeds of the Braeburn Notes to make payments in accordance with paragraph 8(c) of the LPA. Otherwise, paragraph 52N.a is denied.

(b)    It is admitted that the quotation at paragraph 52N.b is accurate.

(c)    As to paragraph 52N.c, it is averred that the GP was also permitted to apply the Q3 2025 Receipts towards the Partnership's legal fees and the ATLS management fee, such expenditure being expressly authorised by paragraph 8(c) of the LPA and paragraph 11 of Amendment 9.

(d)    Paragraph 52N.d is denied. In particular:

(i)    As to Subparagraph 52N.d.i, it is denied that the approved budget in respect of Aethon incorporates funding milestones or any other conditions restricting the GP's power, in the Partnership's best interest, to make payments to Aethon within that budget. The only role of such milestones referred to in budgets is to assist the GP to decide whether it is in the Partnership's best interest to continue to fund the relevant portfolio company. It is further denied that the GP's refusal to allow Aethon and, by consequence, the Partnership, to suffer irreparable harm by withholding funding from Aethon demonstrates any lack of probity.

(ii)    It is admitted that the transfers to Nine Square and Nereid identified at Subparagraph 52N.d.ii were made. These transfers related to asset preservation, including to meet severance costs and legally binding obligations such as payroll and taxes, and, on the true construction of the LPA, fell outside of the budget approval process.

45569452.2.A8559.197133

(iii)   Save that the transfer to Replicate identified at Subparagraph 52N.d.iii is admitted, and that it is admitted that the quotation from paragraph 26 of the LPA is accurate, this paragraph is denied. It is averred that a budget of US$72.25 million was agreed for Replicate. The budget was contained in a contract dated 11 February 2025, signed by the Petitioners. The only condition referred to in this contract was that US$ 9 million could only be called "*commencing upon the closing of the LATAM deal for rabies.*" The payment to Replicate was made properly and in accordance with its approved budget.

(iv)   As to Subparagraph 52N.d.iv, subparagraph 69G(d)(i) above is repeated *mutatis mutandis*.

(e)    Save that it is admitted that the payment to Ascidian was made as pleaded, Paragraph 52N.e is denied. It is denied that the matters pleaded therein show any lack of probity on the GP's part. It is noted that the Petitioners have never sought to particularise any alleged obligation of the GP to withdraw validly issued capital calls following a change of circumstances, and their allegation as to lack of probity is baseless. Without prejudice to the aforesaid, it is admitted that the payment was made to Ascidian as pleaded in this paragraph.

(f)    Save that it is admitted that the transfer to Quinn Emanuel's client account was made as pleaded, Subparagraph 52N.f is denied. It is averred that legal costs incurred by the GP in connection with the Delaware Proceedings and the Cayman Proceedings are properly incurred on behalf of the Partnership.  There is no reason why the GP should not pay funds into the Quinn Emanuel client account and the Petitioners have failed to identify any such reason.

45569452.2.A8559.197133

69H.    Paragraph 52O is denied. It is denied that there was any impropriety or lack of probity as alleged or at all. The Petitioners have failed to explain why they allege the GP was required to seek such validation orders but in any event it is denied the GP was or is so required. As to its sub-paragraphs:

(a)    Paragraph 52O.a is admitted.

(b)    Paragraph 52O.b.i-ii are admitted as partial quotations of Harrison 3. The GP will rely on Harrison 3 for its full terms and effect. Harrison 3 was sworn before any of the Q3 2025 Receipts were received by the GP.

(c)    Save that it is denied that, by 1 August 2025, the GP or Dr Harrison had resolved to allocate US$6 million to Ascidian, Paragraph 52O.c is admitted. The GP intended to use any funds available to the Partnership in accordance with its obligation to deploy such funds as permitted by the LPA and in the best interest of the Partnership.

(d)    Paragraph 52O.d is denied. The GP's evidence for the hearing on 1 August 2025 was in all respects true and not misleading. In particular, the truth of Harrison 3 was not affected by the Q3 2025 Receipts.

(e)    For the reasons identified above, Paragraph 52O.e is denied.

**Alleged improper denials**

69I.    Paragraph 52P is admitted.

69J.    Paragraph 52Q is denied in its entirety and paragraph 60A above is repeated.

69K.    For the reasons above, Paragraph 52R is denied.

45569452.2.A8559.197133

**Alleged failure to maintain records in the manner of a reasonably competent general manager**

69L.   As to Paragraph 52S, it is denied that any matters pleaded therein, even if true, are of sufficient gravity as to give rise to a justifiable loss of trust and confidence by the Petitioners in the GP's ability to manage the Partnership.

(a)   Paragraph 52S.a is admitted.

(b)   The first sentence of Paragraph 52S.b is admitted. As to the second sentence of Paragraph 52S.b, it is averred that section 29(6) of the ELP Act creates an "offence" punishable by a fine. The GP's position is that a general partner could not be properly convicted of this offence or subjected to any punishment under this provision for failures to comply with section 29(1) of the ELP Act which are *de minimis* and which do not cause any prejudice to the partnership or any of its limited partners.

(c)   Paragraph 52S.c is denied. The GP regularly provided updated Lists of Partners to the Petitioners on an ongoing basis throughout the life of the Partnership. It is admitted that these Lists of Partners did not comply with some of the requirements under paragraph 16(b) of the LPA. It is averred that the Petitioners never, until the current proceedings, raised complaints about the adequacy of the Lists of Partners provided by the GP over the previous 13 years.  To the extent that the Petitioners had the right to receive Lists of Partners that complied with all the requirements under paragraph 16(b) of the LPA, such right was thereby waived.

(d)   As to Paragraph 52S.d, it is admitted that the GP did not maintain a Register of Partners in the sense of section 29(1) of the ELP Act until 25 July 2025. It is averred that the Petitioners never requested to see the Register of Partners until these proceedings. Having regularly provided the Petitioners

45569452.2.A8559.197133

with Lists of Partners which they accepted as sufficient, any failure to comply with section 29(1) of the ELP Act was *de minimis* and did not cause any prejudice to the Petitioners or to the Partnership and was thereby waived by the Petitioners. The GP rectified this position upon becoming aware of it by producing a compliant Register of Partners on 25 July 2025.

69M.   As to Paragraph 52T, it is denied that any matters pleaded therein, even if true, are of sufficient gravity as to give rise to a justifiable loss of trust and confidence by the Petitioners in the GP's ability to manage the Partnership. Further, it is denied that the GP failed to maintain a consistent position as regards the extent of the Petitioners' Contingent Subscriptions. As to paragraph 52T.a-c:

(a)   It is admitted that a reasonably competent general partner is required to maintain such records as it requires to discharge its obligations to the partnership. It is averred that the GP has at all times done so. Otherwise, paragraph 52T.a is denied.

(b)   Paragraphs 52T.b-c fail to particularise the allegedly inconsistent figures and explanations, such that it is impossible for the GP to plead back to them. In any event, the inferences advanced in these paragraphs are denied. Following execution of Amendment 20 to the LPA on 21 June 2021 (which had the effect of increasing the Petitioners' Contingent Subscriptions across various pools), the GP consistently provided to the Petitioners detailed amounts of their Contingent Subscriptions and remaining Contingent Subscriptions on the occasion of every capital call made since. The Petitioners never objected to the figures stated in the capital calls at the time the capital calls were sent.

45569452.2.A8559.197133

**Alleged recharging of costs to the portfolio companies**

70.     Save that the GP will refer to the relevant provisions of the LPA with regard to
        expenses for their full terms and effect, and in particular paragraph 11 of
        Amendment 9, Paragraph 53 of the Petition is admitted.  Paragraph 29 above is
        repeated.

71.     Paragraph 54 of the Petition is denied. In particular:

        (a)     Employees of entities connected to ATP have fulfilled various roles at the
                Partnership's portfolio companies.  This approach is more efficient and cost
                effective to the Partnership, and to the portfolio companies, than if the
                portfolio companies had independently hired different people to fulfil each
                of the roles, as it has allowed ATP employees to carry out roles across
                multiple portfolio companies, and for the costs to be apportioned
                accordingly. Furthermore, the ATP employees are high level research and
                development executives, who would otherwise not be available to start-up
                companies.  The process by which this occurred was formalised in 2023
                and as mentioned in Paragraph 54(c) of the Petition, the GP commissioned
                a transfer pricing study by Pricewaterhouse Coopers (which was sent to
                the Family Office), which calculated the costs of the ATP employees
                fulfilling these roles, to ensure that arm's length terms applied accordingly.
                This form of "charge-back" for employee services is very common in the
                industry. The basis on which this allocation of employee costs could be said
                to "deprive" the Petitioners of income via the distribution mechanisms in
                the LPA is not understood.

        (b)     The costs of the employees have historically been included in the budgets,
                which have been provided in all cases to the Family Office.  The GP has,
                accordingly, been fully transparent as to the roles that the ATP employees
                have been carrying out and the terms on which the roles have been

45569452.2.A8559.197133

conducted, and the Family Office has been fully aware of the terms. The availability of the ATP employees to the portfolio companies was essential to their business model and was discussed with, and agreed by, the Family Office on multiple occasions.

(c)    The GP avers that all relevant service agreements and transaction records in relation to the reimbursement of employee costs ~~have now been~~ were disclosed to the Petitioners in the Delaware Proceedings.

72.    It is denied, as pleaded in Paragraph 55 of the Petition, that the travel expenses incurred on behalf of the Partnership and the portfolio companies are exorbitant or demonstrate a serious lack of probity and mismanagement, or give rise to a conflict of interest.  Any apparent concern is unwarranted as the GP has not been inappropriately incurring travel expenses for investment professionals, as suggested or at all.  It is averred that:

(a)    The GP has a detailed and comprehensive Travel and Expenses Reimbursement Policy (the "**Expenses Policy**"), which sets out the policy by which employees can reimburse business expenses and pursuant to which the travel expenses have been incurred and paid.  The stated purpose of the Expenses Policy is to promote good business practices, and it sets out the method and process for reimbursement for all ordinary, necessary and reasonable expenses incurred by employees while conducting business on behalf of ATLS.  The Expenses Policy sets out reasonable limitations as to the expenses that employees may reimburse, including in respect of the mode (and class) of travel, the cost of accommodation, meals and entertainment, and conferences. Travel expenses are allocated based on the purpose for the relevant business travel.  It is averred that travel expenses are incurred and reimbursed in compliance with the Expenses Policy.  A copy of the Expenses Policy has been produced to the Petitioners in the Delaware Proceedings.

64

(b)     Paragraph 11 of Amendment 9 provides that travel expenses shall be paid from the ATLS Fee, save that the Partnership shall be liable for travel expenses relating to making and monitoring investments, including expenses relating to broken deals (except to the extent reimbursed by Operating Companies), all expenses (including travel) related to meetings with the Family Office, and all expenses (including travel and travel-related expenses) relating to any actual or threatened litigation or proceeding involving the Partnership.

(c)     Information on the travel expenses incurred on behalf of the Partnership and the portfolio companies has historically been included in the ATLS Fee Budgets, which have been provided to the Family Office when the ATLS Fee Budgets were prepared. The Family Office had not raised any concerns in relation to the travel expenses incurred on behalf of the Partnership and the portfolio companies prior to the issue of the Petition.

73.     As pleaded above, the GP denies that it has acted in the manner alleged in Paragraphs 56 of the Petition and in the circumstances, Paragraph 56 is denied. This allegation is a further fabrication made to support a Petition brought for the purposes of allowing the Petitioners to avoid their contractual obligations under the LPA.

**Alleged failure to provide information**

74.     Paragraph 57 of the Petition is denied.  In particular:

(a)     Paragraph 57(a) is wholly unparticularised and lacking in sufficient detail to be properly responded to, and does not include any details of which questions and requests the Petitioners are referring to.  However, it is averred that there have been frequent meetings between the GP and the Family Office, and the GP has provided extensive briefing materials to the Family Office, for both Aulos and Ascidian.

45569452.2.A8559.197133

(b)   As to Paragraph 57(b):

(i)   Paragraph 26 of the LPA was added to the LPA by Amendment 22. Paragraph 26 provides, inter alia, that "*If any approval of a new budget is given by the Subject Limited Partner, such approval shall be contingent upon at least $300 million being realized (including through deemed distributions) by the Subject Limited Partner on a sale or financing of its interest in ATP LLC*".

(ii)   As part of the negotiations and discussions regarding Amendment 22, the Petitioners represented that such a financing agreement as contemplated in Amendment 22 would be available as a matter of course. However, the Petitioners have still not closed a financing agreement in the period of over seven months (11 months as at the date of this Amended Defence) since Amendment 22 was executed.

(iii)   Accordingly, the Petitioners are obligated to return to funding the Partnership and the portfolio companies in a rational manner.

(iv)   The Petitioners have, however, acted in an arbitrary manner in denying new budgets, irrespective of the need or merit of each budget.  As stated in the 15 May 2025 Email, the Petitioners have refused to discuss new budgets unless the GP agrees to close down the Early-Stage Companies. The Petitioners have only approved one recent budget, for Replicate in February 2025 following negotiations which were at odds with a long and consistent course of dealing, and in which half of the budget crystallises only upon an unprecedented condition which the Petitioners inserted with which the GP was obliged to comply in order for Replicate to receive a very small amount of funding, so as

45569452.2.A8559.197133

to avoid shutting down the company.  After approving this budget in February 2025, the Petitioners defaulted on a valid capital call made against it on 1 June 2025.

(v)    It is averred that, in their depositions in the Delaware Proceedings, Mr Rybolovlev and Mr Bogdanov admitted that there is no firm offer available to meet the Royalty Refinancing condition that the Petitioners have asked the board of Braeburn to approve. Furthermore, at the latest meeting of the board of Braeburn held on 24 July 2025, after originally asking the Braeburn CEO to present the Petitioners' Royalty Refinancing proposal to the Board for consideration, the Petitioners subsequently asked that it be discussed but not presented for formal consideration. The independent directors of Braeburn (that is, those other than Dr Harrison and Mr Yanchik) considered the deal but considered it was not in the interest of Braeburn and no vote was taken. An independent committee has been formed to work with the Family Office on the Royalty Refinancing, in keeping with the GP's obligations under Amendment 22.

(c)    Paragraph 57(c) is denied and the Petitioners' allegations relating to the Partnership's legal expenses are addressed in paragraphs 82(b)-(d) ~~87 to 88~~ below.

(d)    Paragraphs 57(d) to (f) are unparticularised and the Petitioners have not provided any specific allegations as to occasions on which it is alleged that the Petitioners have not been provided with sufficient information. However, it is averred that:

(i)    In the Delaware Proceedings, the GP has provided full expedited discovery of the Partnership's general ledger, and including full

45569452.2.A8559.197133

financial information, and provided the Petitioners with the opportunity to conduct a deposition of the Partnership's Chief Financial Officer both in his individual capacity and as a corporate representative on certain financial matters requested by the Petitioners.

(ii)    The Partnership is a party to contracts, including investment management agreements, third party funding agreements, and Series A funding agreements with the portfolio companies, copies of which have been produced in the Delaware Proceedings.  The Partnership has also offered the Petitioners the opportunity to depose Joseph Yanchik, a partner who serves in the capacity of the Partnership's chief business officer and who has been overseeing the budget reductions and portfolio company work outs required due to the Family Office's defaults.

(iii)   Paragraphs 55 and 57 above are repeated in relation to the budget approval process and the Petitioners' allegations in respect of the alleged budget milestones. Furthermore, the Series A funding agreements with the portfolio companies may contain more detailed descriptions of the milestones: however, the inclusion of the milestones in ~~the~~ a Series A funding agreement~~s~~ is designed to give the GP a basis for deciding not to provide further funding in the event that an issue has developed that cannot be resolved.  The milestones are not designed to allow the limited partners of the Partnership to resile on their funding commitments, in circumstances where (as averred above) the GP is entrusted under paragraph 2(b) of the LPA with sole control over the business of the Partnership.

45569452.2.A8559.197133

(iv)     The GP has provided quarterly updates to the Family Office as required by the LPA. However, as noted above, the contact between the GP and Family Office has been much more frequent, there having been around 170 meetings in person and via Zoom over the last five years, and many more before this, where the Family Office were kept fully apprised of the Partnership's activities. Capital calls were sent as and when required as a matter of course, in accordance with the LPA, although the GP would reduce or pace capital calls in accordance with the Family Office's requests to meet their stated needs. Until 2025, the Family Office has then met those capital calls, without a reference ever to there being any deficiency in the materials that the GP has provided to the Family Office.  As stated above, there have also been regular and numerous in person meetings between the GP and the Family Office, on a basis that is much more frequent than the provision for such meetings to take place twice per year under Schedule C to the LPA.

(v)      The GP has prepared the ATLS Fee Budget every year.  However, the Family Office has refused to approve any ATLS Fee Budget for 2022 to 2025, with the result that the ATLS Fee has been paid based on the agreed 2021 annual budget, pursuant to paragraph 20 of the LPA.

75.     As to Paragraph 58 of the Petition:

(a)      It is admitted that Section 22 of the ELP Act provides that, "*Subject to any express or implied term of the partnership agreement, each limited partner may demand and shall receive from a general partner true and full information regarding the state of the business and financial condition of the exempted limited partnership*".  It is denied that the GP has acted in breach of Section 22 of the ELP Act as alleged or at all:

45569452.2.A8559.197133

(i)     The Petitioners have not made a proper request to exercise their rights under Section 22 of the ELP Act: in correspondence between 17 and 26 June 2025 the Petitioners purported to exercise their rights to audit the Partnership pursuant to paragraph 16(c) of the LPA (the "**Audit Request**").

(ii)    The Audit Request was a fishing expedition that was served by the Petitioners for the improper purpose of attempting to obtain broad extra-judicial discovery for the purpose of legal proceedings, and would have increased further burdens and costs on the GP for no purpose whatsoever, in circumstances where the parties were simultaneously engaged in conducting discovery in the Delaware Proceedings.  The Audit Request was, accordingly and properly, rejected.

(iii)   However, in rejecting the Audit Request the GP noted to the Petitioners that it would provide broad discovery of documents in the Delaware Proceedings, including of all or substantially all of the books and records sought by the Audit Request.  The GP invited the Petitioners to identify any materials, in addition to their First Requests for Production of Documents and First Set of Interrogatories in the Delaware Proceedings, which they sought to inspect through the Audit Request.  The Petitioners have not done so.  It is averred that, in the discovery that the GP has provided to the Petitioners in the Delaware Proceedings, the GP has now produced copies of the documents sought by the Petitioners in the Audit Request in any event.

(b)     As stated at paragraph 29(c) above, the GP avers that it has complied with – and exceeded – its obligations to provide all relevant information to the Petitioners, pursuant to Schedule C to the LPA or otherwise.

45569452.2.A8559.197133

(c)    It is denied that the GP has denied the Petitioners their rights to information and/or seeks to permanently deprive the Petitioners of their rights in the Delaware Proceedings as alleged in Paragraph 58 of the Petition.

(d)    The GP cannot plead to the last sentence of Paragraph 58 which is wholly unparticularised, save that it is denied that the GP has committed any or any serious breaches of duty and/or that the same has resulted in the Petitioners' alleged loss of trust and confidence in the GP.

(e)    Paragraphs 3 to 12 above are repeated. There has been no breakdown of trust and confidence as alleged. The Petitioners have presented the Petition in response to the Delaware Proceedings in order to avoid the repercussions of their breach of their contractual obligations (express and/or implied) under the LPA. The allegations relating to the provision of information are, as with all the allegations in the Petition, without foundation and have been fabricated to create the illusion of there being sufficient grounds for the winding up of the Partnership where none exist.

**Alleged conflicts of interest and/or breach of fiduciary duty to act in good faith in the interests of the Partnership**

76.    Paragraph 59 of the Petition is denied.

77.    As to Paragraph 60:

(a)    The GP repeats its defence at paragraph 37 above. The fact that the Capital Calls are not specifically referenced in the Delaware Complaint is irrelevant.  It is denied that the issuance of the Capital Calls amounts to a breach, let alone a further breach, of the GP's duty to act in good faith in the interests of the Partnership.  The Capital Calls were issued in good faith and for proper purposes and were intra vires.

45569452.2.A8559.197133

(b)   It is denied that the Capital Calls are part of an alleged or any litigation strategy on the part of the GP.

(c)   It is denied that there is any inconsistency between the Capital Calls and the funding scenario proposed by the GP on 30 April 2025.  The GP made it clear in correspondence with the Family Office at the relevant time that the GP's proposal on 30 April 2025 was a triage strategy in light of the Family Office's starvation of the Partnership.  It was a good faith attempt by the GP to accommodate the Family Office's funding concerns, which is now being misused by the Petitioners as supposed evidence of the GP's improper motives.

(d)   It is denied that it can be inferred and/or is a fact that the GP does not consider that the Early-Stage Companies are viable investments and/or worthy of deploying the capital called in the Capital Calls.  As stated above, the funding proposal in April 2025 was purely a response to the situation that the Family Office had placed the Partnership in as a result of the Family Office's reluctance to continue funding the Partnership and the portfolio companies.  It was, and is, incorrect to suggest that the GP sees no value in the Early-Stage Companies.  Paragraph 51 above is repeated.

78.   The relief sought in the Delaware Complaint is self-explanatory and it is denied that the Delaware Proceedings have been designed to attempt to persuade the Delaware Court to compel the Petitioners to provide further funding for the portfolio companies, as alleged in Paragraph 61 of the Petition or at all.

79.   The Petitioners have refused to meet the Capital Calls. Contrary to Paragraph 62 of the Petition, however, the funding called for by the Capital Calls is in the interest of the Partnership, and not, as alleged, in the interests of the GP and its employees and ATP.  It is denied that the GP has a demonstrable conflict of interest as alleged or at all.  The arrangements between the parties have been in place since the

45569452.2.A8559.197133

inception of the Partnership. The Family Office has not previously raised any concerns as to the alleged conflict of interest involving the GP, its employees and ATP, and was fully aware of the corporate structure throughout the existence of the Partnership of over 12 years. It is admitted that Dr Harrison is a director of each of the portfolio companies. It is averred that, apart from Aethon and Marlinspike, all Portfolio Companies have at least one board member who is not an employee of the GP or its affiliates. It is denied, if alleged, that the fact that Dr Harrison owes fiduciary duties to the Portfolio Companies creates any actual or potential conflict of interest for the GP. If, which is denied, it did create such an actual or potential conflict of interest: (i) that was fully disclosed and consented to by the Petitioners, over the entirety if the Partnership's operation since inception and (ii) appropriate recusals would occur where warranted. It is averred that the management structure of the Partnership's portfolio is standard in biotech venture capital. In the premises, it is denied that the Petitioners have lost trust and confidence in the GP's ability to manage the Partnership and/or that the matters alleged by the Petitioners are the cause of any such alleged loss of trust and confidence. The allegations concerning the purported conflicts of interest have been manufactured falsely to inflate the Petitioners' grounds for the Petition.

79A.    Paragraph 62A is denied:

(a)    It is denied there was such actual or potential conflict. Further, or alternatively, the matters said to give rise to the actual or potential conflict and were fully disclosed to the Petitioners who never objected to and consented to them. Accordingly, if which is denied, there was any such actual or potential conflict, the same was fully disclosed and consented to by the Petitioners, and the GP has not breached any duty, as alleged or at all.

(b)    As to (a), paragraph 79A(a) above is repeated *mutatis mutandis*.

45569452.2.A8559.197133

(c)     As to the first (b), the Petitioners fail to particularise what steps to manage the alleged conflict the GP ought to have taken in May 2025. It is denied that there is any such conflict or that there were any such steps.

(d)     As to the second (b), it is admitted that the GP did not agree to the Petitioners' proposal to appoint a conflict director in July 2025.  The GP was entitled to do so.  The Petitioners' proposal was not made in the best interest of the Partnership but instead for the purpose of giving the Petitioners' nominee, and by implication the Petitioners, effective executive control over Partnership's affairs. The GP will rely at trial on the full terms of the Petitioners' proposal.

80.     ~~As to Paragraph 63, it is denied that the Partnership is exposed to "open-ended" funding commitments to the portfolio companies, to the extent that term is understood. The Petitioners have been provided with all relevant financial information concerning the Partnership's initial investments in the portfolio companies, including in advance of the Partnership reaching any agreements with the respective portfolio companies, and the ongoing and upcoming funding needs of the portfolio companies as their research and development operations have progressed.  Paragraph 78(d) above is repeated with respect to the Partnership's obligations to the portfolio companies.~~

81.     ~~Paragraph 64 is denied, and paragraph 78(d) above is repeated. It is averred that the Petitioners have previously approved the budgets relating to the portfolio companies for which the Capital Calls have been issued, and the Petitioners have failed to meet those Capital Calls notwithstanding their prior agreement to the budgets on which the Capital Calls are based.  Paragraphs 30 and 55 above are repeated in relation to the budget approval process, and it is averred that this process was repeatedly and successfully facilitated until the Petitioners adopted the position in May 2025 that they no longer wished, and were not legally required, to continue funding the Partnership and the portfolio companies.~~

45569452.2.A8559.197133

82.    ~~The Petitioners' alleged concerns~~ The allegations set out in Paragraph 65 are misconceived and unfounded:

(a)    Save that it is admitted that email correspondence in December 2024 took place between Mr Bogdanov and Dr Harrison on the one hand, and Patrik Blochlinger and Daniel Finkelman on the other, on the dates set out in paragraphs 65(a)-(c) and (e), Paragraph 65 is denied.

(b)    The legal costs associated with the Braeburn Proceedings have not been charged to the Partnership and do not form any part of the Capital Calls.  It is averred that the email from Mr Finkelman to Mr Blochlinger dated 23 December 2024, which is partially quoted in Paragraph 65(c) of the Petition, also provided that: "***This email will also confirm that all other charges have been allocated and are being paid in accordance with the expense provisions of the settlement wrapper, including the Cayman litigation, the ATP royalty sub LLC agreement, the put option agreement, the second put option agreement and amendment 22 to the LPA. For your information, we currently estimate aggregate charges borne or to be borne by ATLS and/or Seth for that work to be $2.3M.*** *As mentioned during our calls last Thursday, Seth would like to discuss with Yuri the allocation of those charges in light of the extended time and complexity involved in working through the restructuring documents, including the provisions relating to the Family Office obtaining early liquidity on a portion of the royalty stream*." (emphasis added)

(c)    The Petitioners' assertion that the treatment of the legal fees in relation to the Braeburn Proceedings form any basis for a loss of trust and confidence therefore has no basis.

(d)    As to Paragraph 65(f), paragraph 11 of Amendment 9 provides that, with the exception of certain defined expenses that are paid from the ATLS Fee

(which is the annual fee payable by the Partnership to ATLS), *"[t]he Partnership shall be responsible for all other reasonable expenses of the Partnership, which Partnership expenses shall be funded by capital contributions made by the holders of Preferred Units in accordance with the Agreement, including without limitation: […] (vii) professional fees, including legal expenses for the Partnership (including the Partnership's inhouse counsel), audit, tax compliance and tax structuring fees and expenses, […] (xvii) all expenses (including travel and travel-related expenses) relating to any actual or threatened litigation or proceeding involving the Partnership"*. In the premises, the legal fees that the GP has incurred on behalf of the Partnership fall to be paid by the Partnership.

82A.    Paragraph 65A is denied. Paragraph 5.1 of the Settlement Agreement expressly contemplated that the GP would pay its costs "*using its own money (for example, money it has received as payment of a Management Fee*". The invoices listed in Paragraphs 65A.a-h were paid using the ATLS Management Fee, and therefore not in breach of the LPA. Without waiver of privilege, it is denied that the further invoices referred to in paragraphs 65A(a) to (h) related to the Braeburn Proceedings.

**D.    GROUND 2**

83.    It is denied that the Partnership is no longer being run in accordance with the reasonable expectations of the limited partners and/or in accordance with the LPA as alleged in Paragraph 66 of the Petition or at all. It is averred, in particular, that:

(a)    The Partnerships' investment strategy has been approved by the Petitioners throughout the existence of the Partnership over the course of over 12 years, and the Partnership has not changed or neglected its investment strategy.

45569452.2.A8559.197133

(b)     The fact that the Petitioners no longer wish to continue the funding of the Partnership and the portfolio companies, in breach of their funding obligations under the LPA, does not mean that the Partnership is not being run in accordance with the LPA and/or to the detriment of the Petitioners or the other limited partners.

(c)     As stated in paragraph 4 above, the Partnership has been hugely successful under the stewardship of the GP, and the Partnership's investment decisions have resulted in extraordinary returns to the Petitioners in their capacity as limited partners of the Partnership.

(d)     The GP has no intent to "confiscate" 50% of the Petitioners' interests.  The operation of the global default mechanism as set out in paragraph 5(c) of the LPA (which, as the Petitioners are well aware, has been included in the LPA from the outset) has been caused by the Petitioners' failure to meet their obligations pursuant to the Capital Calls in accordance with the LPA. The global default mechanism is a provision which the GP is entitled to rely on in the circumstances, and the GP does so acting in the best interests of the Partnership.  Paragraphs 64 and 65 above are repeated.

(e)     The Petitioners have brought about the present situation by their failure/refusal to pay the Capital Calls and/or to approve budgets for future investment of capital in the Partnership.

## E.     <u>GROUND 3</u>

84.     For all the reasons pleaded above, it is denied that there is any need for a proper, independent, investigation into the Partnership's affairs.

45569452.2.A8559.197133

**F.**    <u>**CONCLUSION**</u>

85.    It is denied that it is just and equitable that the Partnership be wound up.


**SUE PREVEZER KC**
**Brick Court Chambers**

<span style="color:red">**ANDREW AYRES KC**
**Twenty Essex**</span>

**WALKERS (CAYMAN) LLP**

<span style="color:red">~~20 August 2025~~</span>

<span style="color:red">20 November 2025</span>

**<u>EXHIBIT C</u>**

 **Walkers**

**BY EMAIL**

3 December 2025                                        Our Ref: JG/SW/RB/197133

Campbells LLP
Floor 4, Willow House
Cricket Square
Grand Cayman KY1-9010
Cayman Islands

**Attention: Liam Faulkner, Hugo Farmer and Jordie Fienberg**

Dear Campbells

**UNICORN BIOTECH VENTURES ONE LTD (IN ITS CAPACITY AS GENERAL PARTNER
OF RIGMORA BIOTECH INVESTOR ONE LP) AND UNICORN BIOTECH VENTURES TWO
LTD (IN ITS CAPACITY AS GENERAL PARTNER OF RIGMORA BIOTECH INVESTOR
TWO LP) V ATP III GP, LTD (IN ITS CAPACITY AS GENERAL PARTNER OF ATP LIFE
SCIENCE VENTURES, L.P.)
CAUSE NO. FSD 146 OF 2025 (JAJ)**

**IN THE MATTER OF ATP LIFE SCIENCE VENTURES, L.P.
CAUSE NO. FSD 151 OF 2025 (JAJ)**

1.      We write regarding our client's Privilege Summonses and the Court's email dated 1
        December in which the Judge dismissed our client's summonses (the "**Court's
        Email**"). We note that the Court's Email indicated that a fully reasoned judgment would
        follow in due course.

2.      We write to put your clients on notice that our client intends to urgently appeal the
        Court's decision on the Privilege Summonses (the "**Privilege Appeal**"). In that regard,
        our client will plainly not be in a position to file an application for leave to appeal before
        the Court's fully reasoned judgment is available. In circumstances where the parties
        are operating on a condensed trial timetable, and in an effort to mitigate any disruption
        to the trial fixture, our client now writes to propose the following pragmatic approach:

        (a)     As you will have noted, our client has already written to the Judge to request
                that his fully reasoned judgment in respect of the Privilege Summonses be
                provided as soon as possible;

        (b)     Upon receipt of the fully reasoned judgment in draft form, our client will seek
                to file its application for leave to appeal within 7 days of receipt of the same
                (the "**Leave Application**");

**Walkers**

190 Elgin Avenue, George Town
Grand Cayman KY1-9001, Cayman Islands
**T** +1 345 949 0100 **F** +1 345 949 7886  www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

(c)     Upon receipt of our client's Leave Application, we propose that your clients confirm within 2 days of service of the same whether they will oppose the application and, if so, on what basis. More specifically:

(i)      In the event that your clients confirm that they will not object to the Leave Application, we intend to seek the Court's leave to appeal by presenting it with draft consent orders in respect of the Privilege Summonses to that effect; or

(ii)     Alternatively, in the event that your clients indicate they will oppose the Leave Application, we propose that the parties will thereafter liaise with the listing officer to list our client's Leave Application as soon as possible on a date mutually convenient to the parties and the Court and, upon a listing date being provided, agree directions for submissions.

3.     We also confirm that, should our client be granted leave to appeal from this Court, our client intends to write to the Court of Appeal to seek a special sitting so as to ensure the Privilege Appeal can proceed as swiftly as possible.

4.     In our view, on any proper analysis and to protect the existing trial timetable, we consider that the most efficient course is for your clients to confirm they raise no objection to our client's Leave Application in this Court so as to facilitate it being granted expeditiously. This is particularly so in circumstances in which, in the event that our client's Leave Application were to be refused in this Court, our client would have no alternative but to seek leave to appeal by way of an *ex parte* application to the Court of Appeal which will inevitably only cause further delay to the progress of our client's prospective appeal.

5.     Accordingly, please confirm your clients' agreement to the above proposed approach.

6.     For the avoidance of doubt, our client is ready and willing to proceed to trial on 12 January 2026 and does not presently seek any variation to the directions to trial. The only effect of the Privilege Appeal, as matters stand, is that the trial cannot proceed by reference to the Compelled Documents unless and until the appeal is determined adversely to our client.

7.     We separately address the respective consequential matters arising from our client's prospective Privilege Appeal below.

**Volume H Loadfile**

8.     We refer to your email of 6:24am on 2 December and the enclosed loadfile containing the documents which your clients have proposed be uploaded to Volume H of the trial

45668217.1.A8559.192486

bundle. We note that the loadfile attached to your email contains 84 of the Compelled Documents[1].

9.      We can confirm that our client will not, at this stage, consent to the upload of the loadfile as provided for the following reasons:

      (a)      The purpose of our client's Privilege Appeal is to restrain your clients' use at trial of a subset of the Compelled Documents relating to hostile litigation between the parties. Whilst the Privilege Appeal remains extant and directed to that very issue, it would be improper to include within the trial bundle the documents which are the subject of the proposed Privilege Appeal; and

      (b)      This is particularly so because, if the Court were to see those materials and the Privilege Appeal were subsequently allowed, the prejudice would be irreparable such that the likely (if not inevitable) consequence would be a re-trial, with substantial cost and delay for all parties.

10.     Accordingly, we ask that your clients provide a revised loadfile excluding any of the Compelled Documents relating to hostile litigation between the parties for our prompt review.

11.     We would also ask that your clients refrain from uploading any Compelled Documents relating to hostile litigation between the parties pending determination of our client's Privilege Appeal.

12.     To the extent that your clients will seek to rely on the Hostile Litigation Documents for the purpose of their trial statements which are due on 5 December, we put you on notice that any reference to the Hostile Litigation Documents either in your clients' witness statements themselves (whether by virtue of a passing reference or express quotation) and/or in any exhibit ought to be properly redacted before being filed with the Court pending the outcome of our client's Privilege Appeal.

**Invoices Letter**

13.     We refer to your letter dated 24 November 2025 in which you asked our client to provide unredacted copies of numerous legal invoices, or, in the alternative, to describe the legal matters covered by those invoices and why it is asserted that the redacted information is covered by legal privilege.

14.     We can confirm that our client will not provide unredacted versions of the legal invoices to your clients. The information redacted in those invoices was properly redacted due to legal privilege. Your clients are not entitled to see that information, which is and

---

[1] We note that a substantial number of the 84 documents contained in your clients' loadfile appear to consist of a subset of the Compelled Documents that relate to disputes between the GP/Partnership and the Rigmora LPs (the "**Hostile Litigation Documents**").

45668217.1.A8559.192486

remains privileged, or to be provided with a description of the privileged material that has been appropriately redacted. We trust this brings an end to this line of correspondence.

**Status of Documents in the Trial Bundle**

15.     We confirm that our client does not consent to documents within Volume H automatically standing as evidence in the proceedings.

16.     It would not be appropriate to agree that all documents in the trial bundle automatically stand as evidence because mere inclusion in the bundle does not establish either admissibility or the truth of their contents, and short-circuits the safeguards that ensure a fair trial.

17.     The civil evidence regime draws a clear distinction between authenticity, admissibility and weight and documents relied upon for their truth should either (i) be proved through a witness statement that stands as evidence in chief, allowing for proper testing by cross-examination, or (ii) be adduced as hearsay with a compliant notice so that the opposing party has a fair opportunity to address reliability, context and weight.

18.     Collapsing these safeguards by deeming the entire bundle to be in evidence risks admitting material that is irrelevant, duplicative, or unfairly prejudicial, encourages trial by documents without proper foundations, and invites disputes at the point of submissions rather than through orderly proof. It also creates procedural unfairness by shifting the burden onto the responding party to police an amorphous mass of material and to anticipate unpleaded or undeveloped points smuggled in via the bundle, increasing the risk of satellite skirmishes about scope and weight. This is also a particularly unattractive approach in circumstances where the parties are already operating on an extremely condensed trial timetable. The parties should be endeavouring to streamline matters rather than adopting broadbrush approaches which will plainly have a much wider (and likely prejudicial) effect at trial.

19.     On that basis, we consider that our client's proposed approach preserves procedural clarity, ensures efficient case management, and protects against trial by ambush while still allowing the parties to agree authenticity or other limited uses where appropriate.

20.     If your clients wish to proceed on the basis they have proposed, we invite them to issue an application for appropriate declarations to that effect at the PTR.

**Confidentiality Ring Order**

21.     Further to your second email of 12:16pm on 2 December 2025, the form of any confidentiality ring order will plainly be shaped by the outcome of our client's Privilege Appeal. On that basis, we do not consider it appropriate to provide a draft of that order until such time as the appeal is determined.

22.     Please provide a response to this letter by 4pm on 4 December.

Yours faithfully

*Walkers (Cayman) LLP*

**WALKERS (CAYMAN) LLP**

## EXHIBIT D

 Walkers

**BY EMAIL**

9 December 2025                                                    Our Ref: JG/SW/RB/197133

Campbells LLP
Floor 4, Willow House
Cricket Square
Grand Cayman KY1-9010
Cayman Islands

**Attention: Liam Faulkner, Hugo Farmer and Jordie Fienberg**

Dear Campbells

**UNICORN BIOTECH VENTURES ONE LTD (IN ITS CAPACITY AS GENERAL PARTNER OF RIGMORA BIOTECH INVESTOR ONE LP) AND UNICORN BIOTECH VENTURES TWO LTD (IN ITS CAPACITY AS GENERAL PARTNER OF RIGMORA BIOTECH INVESTOR TWO LP) V ATP III GP, LTD (IN ITS CAPACITY AS GENERAL PARTNER OF ATP LIFE SCIENCE VENTURES, L.P.)**
**CAUSE NO. FSD 146 OF 2025 (JAJ)**

**IN THE MATTER OF ATP LIFE SCIENCE VENTURES, L.P.**
**CAUSE NO. FSD 151 OF 2025 (JAJ)**

1.      We refer to your letter dated 4 December 2025 ("**Your Letter**"). Where terms aren't defined, we adopt the definitions used in previous correspondence.

        **Appeal and timetable**

2.      First, Your Letter appears to contend that because the parties are working to an expedited trial, any appeal should be discouraged or treated as waived. We reject that analysis. The existence of a compressed timetable does not, and cannot, deprive parties of their statutory and constitutional rights of appeal.

3.      Second, and for the avoidance of doubt, we reject any suggestion in Your Letter that our client's appeal is in any way unmeritorious or a tactical attempt to delay the trial.

4.      Third, as you will have seen (and contrary to your comments regarding our client's purported delay tactics), we have urgently requested the delivery of the Judge's fully reasoned judgment on the Privilege Summonses, and we have made immediate enquiries with the Court of Appeal regarding the earliest availability for an urgent hearing of our client's Privilege Appeal. In that context, it is unfortunate that your clients have not sought to agree our client's application for leave to appeal. That stance will, inevitably, generate further interlocutory steps and consequent delay in progressing the appeal.

**Walkers**

190 Elgin Avenue, George Town
Grand Cayman KY1-9001, Cayman Islands
**T** +1 345 949 0100 **F** +1 345 949 7886  www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

5.      Fourth, and further to our client's email of 8 December to the clerk of the CICA, please provide your leading counsel's dates of availability between now and the trial for the listing of our client's urgent appeal so that the CICA can be approached on a joint basis for listing.

6.      Fifth, turning to your clients' request that our client confirm it will not renew any application for leave to appeal to the CICA *ex parte*, that request is rejected. Our client has a statutory entitlement to seek leave from a single judge of the CICA *ex parte* on the papers and reserves that route as the appropriate and most expeditious course should leave be refused below.

**Stay**

7.      For the avoidance of doubt, any application for a stay of Justice Asif's decision will be pursued in tandem with our client's application for leave to appeal.

8.      In the interim, we would invite your clients to agree to the safeguarding mechanisms identified at paragraphs 9 to 14 below pending our client's application for a stay for the reasons contained therein.

**Witness statements**

9.      Our client's approach to redactions in witness statements is directed to preventing Justice Asif from having sight of the Hostile Litigation Documents pending the determination of our client's Privilege Appeal.

10.     As should be plain to your clients, if the Privilege Appeal is successful after the Judge has seen the impugned documents, the prejudice cannot be undone and the Judge would have no option but to recuse himself, with the inevitable consequence of either a re-trial or, alternatively further delay in obtaining a substitute Judge, both of which will result in additional cost and disruption for all parties. It is perplexing that your clients resist a straightforward approach designed precisely to avoid that outcome.

**Volume H and the Compelled Documents**

11.     As stated in our letter of 3 December, our client cannot consent to the inclusion in the trial bundle of the subset of the Hostile Litigation Documents whilst the Privilege Appeal is extant. Including such documents now would risk irreparable prejudice and the risks we have identified above if the Privilege Appeal is subsequently allowed.

12.     Further, it was plainly inappropriate of your clients to instruct Opus 2 to proceed with the upload to Volume H without our client's consent, on only a few minutes' notice, in circumstances where your clients had been notified that a substantive response would follow during the course of that day. In Your Letter, your clients also rely on the parties' 24-hour agreement around loadfile objections and the timestamp of an email. With respect, that does not meet the point. The expiry of a 24-hour window does not entitle

your clients to unilaterally instruct Opus 2 to upload documents, particularly after being told that a substantive response would follow the next day. The objection is not a procedural quibble about loadfile mechanics; it goes to the propriety of placing disputed materials before the Court in circumstances where an appeal on that very issue is being pursued.

13.    Your Letter's separate assertion that there is "no basis" for our client to object to the Volume H loadfile is misplaced: the objection arises precisely because the appeal is directed at restraining the use at trial of the Hostile Litigation Documents.

14.    As we have already identified, the prudent course is to exclude the Hostile Litigation Documents from any upload pending resolution of the Privilege Appeal. Our client maintains its position that references to those documents in trial statements should be appropriately redacted on an interim basis and we put you on notice accordingly, as previously set out.

### Confidentiality ring order

15.    As we have already outlined, there is no purpose in the parties preparing or negotiating a confidentiality ring order at this stage when the scope of any such order will plainly be dictated by the outcome of the Privilege Appeal. We, therefore, do not propose to circulate a draft order until the appeal has been determined, at which point the scope and carve-outs can be addressed in light of the appellate ruling.

### Status of documents in the trial bundle

16.    We note your attempt to elide the mechanics of compiling a trial bundle with the evidential status of its contents. Our client does not agree that documents in Volume H, or elsewhere in the bundle, should automatically stand as evidence of the truth of their contents merely by inclusion.

17.    In so far as you rely on the Grand Court Rules to suggest that authenticity objections have been waived, you cite GCR O.27 r.4 and the 21-day period from inspection. That rule addresses authenticity objections; it does not convert bundle inclusion into proof of truth or admissibility for all purposes.

18.    As we have previously outlined, we consider that our client's position preserves procedural clarity and efficiency whist maintaining evidentiary safeguards to avoid against trial by documentary ambush. If your clients wish to proceed as proposed, you may put the issue before the Court at the PTR and our client will oppose such relief.

Yours faithfully

*Walkers (Cayman) LLP*

**WALKERS (CAYMAN) LLP**

**EXHIBIT E**

Digitally signed by Advance Performance Exponents Inc.
Date: 2025.11.20 17:19:12 -05:00
Reason: Apex Certified
Location: Apex



CAUSE NO. FSD 151 OF 2025 (JAJ)

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**IN THE MATTER OF THE EXEMPTED LIMITED PARTNERSHIP ACT (2025 REVISION), THE COMPANIES ACT (2025 REVISION) AND THE PARTNERSHIP ACT (2025 REVISION)**
**AND IN THE MATTER OF ATP LIFE SCIENCE VENTURES, L.P.**

**BEFORE THE HONOURABLE JUSTICE JALIL ASIF KC**
**IN CHAMBERS**

**31 OCTOBER 2025**

---

### CONSENT ORDER FOR DIRECTIONS (TRIAL)

---

**UPON** the summons for directions filed on 15 July 2025 by the Petitioners restored for the purpose of a case management conference

**AND UPON** hearing leading counsel for the Petitioners and leading counsel for the Respondent

**AND UPON** the parties indicating by their attorneys their consent to the Court making an Order in the following terms

**IT IS HEREBY ORDERED BY CONSENT that:**

Direction pursuant to CWR O.3, r.12

1.    The Court declines to make any order pursuant to CWR O.3, r.12(1)(a) or (b) on the ground that those Rules are inappropriate to apply to an exempted limited partnership.

Discovery and inspection

2.    The date specified in paragraph 7 of the Consent Order dated 1 August 2025 for the parties to give discovery and inspection is extended to 30 October 2025.

**THIS ORDER** was filed by Campbells LLP, Attorneys for the Petitioners, whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, Cayman Islands (Ref: LMF/PDK/HFA/19135-44991)

Evidence of fact

3.   Evidence of fact in these proceedings, including verification of the Amended Petition, shall be given by witness statement in accordance with the Grand Court Rules, O. 38, r. 2A.

4.   By 3:00 pm on 5 December 2025, the parties shall file and serve signed statements of all witnesses of fact on whom they intend to rely at trial and all hearsay notices (if any) in accordance with the requirements of GCR O.38.

5.   By 3:00 pm on 15 December 2025, the parties shall file and serve signed statements containing any evidence in reply to evidence served by the other side, all hearsay notices (if any) in respect of the reply evidence in accordance with the requirements of GCR O.38 and any hearsay counter-notices in response to the hearsay notices served in accordance with paragraph 4 above.

6.   By 12:00 pm on 16 December 2025, the parties shall file and serve any hearsay counter-notices in response to the hearsay notices served in accordance with paragraph 5 above.

7.   Any witness statement filed in FSD 146 of 2025 (JAJ) shall be deemed also to have been filed and to be admissible in these proceedings.

8.   Until further order of the Court, no witness statement shall refer to any of the documents which are the subject of the Defendant's summons filed on 2 October 2025 to exclude certain documents from inspection and use within these proceedings on the grounds of privilege.

9.   The parties shall not be entitled to adduce evidence at trial from any witness whose signed statement has not been served in accordance with this Order, except with leave of the trial judge.

10.   The witness statements of any witness giving oral evidence at trial shall stand as their evidence in chief. Each party shall be permitted up to 5 minutes with each witness, or such additional time as the trial judge directs, to address any additional matters necessary to be covered by that witness's evidence in chief which were not reasonably foreseeable when their statement(s) were signed.

11.   By 4:00 pm on 16 December 2025, each party shall give notice to the other party of all witnesses of fact whose evidence is agreed and all witnesses of fact whose attendance at trial they require for cross-examination.

12.   Subject to the admissibility of evidence pursuant to a hearsay notice or direction of the trial judge, where notice requiring attendance of a witness for cross-examination has been given, if that witness does not attend the trial for cross-examination, their witness statement will not be admitted into evidence.

Preparation for trial

13.   There shall be a pre-trial review at 10:00 am on 17 December 2025, with a time estimate of 2 hours, to be held as a hybrid hearing. All counsel who it is intended shall appear as an advocate at the trial shall attend.

14.   By 4:00 pm on 18 December 2025, the parties shall lodge the agreed trial bundles with the Court, complying with the requirements of GCR O.34, r.10.

15.   By no later than 4:00 pm on 18 December 2025, the parties shall also seek to agree a chronology, cross-referenced to the trial bundle, a dramatis personae, a list of issues to be determined at trial and a proposed trial timetable.

**THIS ORDER** was filed by Campbells LLP, Attorneys for the Petitioners, whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, Cayman Islands (Ref: LMF/PDK/HFA/19135-44991)

16.  By 12:00 pm on 5 January 2026, the parties shall file and exchange their skeleton arguments for the trial.

17.  Save as varied by this Order or further Order, the parties shall follow and apply the practice and procedure set out in the FSD Guide (Second Edition).

<u>Costs</u>

18.  The Petitioners shall pay the Respondent's costs of Petitioners' application for a direction pursuant to CWR O.3, r.12(1)(a) or (b) in any event, to be taxed on the standard basis if not agreed.

19.  Save as provided for in the previous paragraph, the costs of and occasioned by the case management conference shall be costs in the cause.

20.  Liberty to apply.

**Dated 31 October 2025**
Filed 20 November 2025

_____

**THE HONOURABLE JUSTICE JALIL ASIF KC**
**JUDGE OF THE GRAND COURT**

**THIS ORDER** was filed by Campbells LLP, Attorneys for the Petitioners, whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, Cayman Islands (Ref: LMF/PDK/HFA/19135-44991)